632 F.2d 1045
 SOCIETY HILL CIVIC ASSOCIATION, Mrs. James Dugan, Mrs. Hebe
Dick Baldwin, Herman and Reba Miller, Jack and Beatrice
Weinstein, Morris and Betty Kratz, Ethel and Arthur
Kratchman, Mrs. Simon Hymowitz, Mrs. Joseph Apilungo, Mrs.
Isadore Levin, Appellants,
v.
Patricia Roberts HARRIS, Secretary, Thomas C. Maloney,
Regional Administrator, Region III, Robert J. Clement,
Acting Area Director, Philadelphia Area Office, all of the
United States Department of Housing & Urban Development, the
United States Department of Housing & Urban Development,
Augustine Salvitti, Executive Director of the Philadelphia
Redevelopment Authority, and the Philadelphia Redevelopment
Authority, Appellees,
Mable Dodson, Florence Hayes, Dorothy Miller, Evelyn Powell
and Marlene Weber, Intervenor-Appellees.
 No. 79-2361.
 United States Court of Appeals,
Third Circuit.
 Argued March 24, 1980.
Decided Aug. 25, 1980.
 
 Olan B. Lowrey (argued), Philadelphia, Pa., for appellants.
 Sally Akan (argued), Pepper, Hamilton & Scheetz, Philadelphia, Pa., Harold R. Berk, Community Legal Services, Inc., Philadelphia, Pa., for individual appellees.
 Peter F. Vaira, U. S. Atty., Walter S. Batty, Jr., Asst. U. S. Atty., Antoinette R. Stone (argued), Asst. U. S. Atty., Philadelphia, Pa., for appellee Patricia R. Harris, et al.
 Before ROSENN, GARTH and SLOVITER, Circuit Judges.
 OPINION OF THE COURT
 GARTH, Circuit Judge.
 
 
 1
 Society Hill is a fashionable neighborhood in Philadelphia. The Society Hill Civic Association (the Association) is a group of property owners residing in that neighborhood. The United States Department of Housing and Urban Development (HUD) and the Philadelphia Redevelopment Authority (RDA) are cooperating to build a small number of units of low-income housing in Society Hill. HUD and RDA are bound to fund this housing under the terms of a consent decree entered in an earlier litigation, Dodson v. Salvitti, No. 74-1854 (E.D.Pa.1977), aff'd mem., 571 F.2d 571 (3d Cir.), cert. denied, 439 U.S. 883, 99 S.Ct. 222, 58 L.Ed.2d 195 (1978).
 
 
 2
 In the instant suit, the Association and several individual homeowners seek to attack the prior consent decree. Judgment on the pleadings was granted by the district court in favor of the defendants, HUD, RDA and various officials of those agencies. The Association and the individual plaintiffs now appeal this determination.[1]
 
 
 3
 Because we conclude that, on the present record, the Association's action cannot be deemed to be barred by the prior consent decree, and because we find that the Association's complaint sets forth a number of claims inappropriate for disposition by judgment on the pleadings, we reverse the district court's judgment and remand for further proceedings.
 
 I.
 
 4
 This case illustrates the unfortunate hostility and distrust that is often generated by urban renewal. The Association, plaintiff below and appellant here, represents the interests of property owners who seek to preserve property values and a perceived quality of life in Society Hill. The defendants, HUD and RDA, are two government agencies responsible for funding the urban renewal project that the Association claims will infringe its members' rights. The intervenors, Mable Dodson and others, are the tenants who are to be allocated urban renewal housing under the prior consent decree entered into by HUD, RDA, and themselves.
 
 
 5
 This case is the third in a series of related cases carrying forward the dispute over urban renewal in Society Hill. Initially, the tenants' landlord, a nonprofit housing corporation called the Octavia Hill Association, sought to evict them, the tenants, from their homes to allow rehabilitation of the property. Octavia Hill brought six actions in ejectment in the state courts of Pennsylvania. After removal to federal district court, a consent decree was entered into which provided that the tenants would surrender possession of their tenancies in return for, among other things, temporary housing as well as RDA's promise to attempt to rehabilitate certain property on Pine Street in Society Hill as a permanent relocation resource. Octavia Hill Association, Inc. v. Hayes (Dodson), Nos. 73-1594 to -1599 (E.D.Pa. Oct. 16, 1973). Eventually, a further court order was entered on June 28, 1974 to enforce the Octavia Hill consent decree.
 
 
 6
 Subsequently the tenants filed a class action[2] in federal district court against HUD and RDA complaining of their failure to carry out their obligations under various federal constitutional and statutory provisions to provide the tenants with permanent relocation housing.[3] This litigation was captioned Dodson v. Salvitti. Class certification in this tenants' action was denied. A motion for intervention by local property owners (neighbors of those represented by the Association in the present case) was denied on grounds of untimeliness and lack of a legal interest sufficient to support intervention. Dodson v. Salvitti, 77 F.R.D. 674 (E.D.Pa.1977). Ultimately a second consent decree was approved in Salvitti providing for permanent housing for the tenants in new units to be constructed through the joint efforts of HUD and RDA. Dodson v. Salvitti, No. 74-1854 (E.D.Pa. Sept. 16, 1977), aff'd mem., 571 F.2d 571 (3d Cir.), cert. denied, 439 U.S. 883, 99 S.Ct. 222, 58 L.Ed.2d 195 (1978). No such relief had been provided in the earlier Octavia Hill consent decree.
 
 
 7
 The present action challenges the Salvitti consent decree. The Association brought suit against HUD and several of its officers, and against RDA and its executive director, Augustine Salvitti. Several of the tenants intervened as defendants. The Association claimed, first, that the Dodson consent decree was illegal because it was collaterally barred by the Octavia Hill consent decree, and second, that the Dodson consent decree was independently violative of various federal constitutional provisions and various state and federal statutes and regulations. The district court dismissed the entire action on the pleadings, under Fed.R.Civ.P. 12(c), on two independent grounds. The district court held that the Association's action constituted an impermissible collateral attack on a valid consent decree, since it concluded that the Association should have intervened in Dodson v. Salvitti to protect its interests. Alternatively, the district court held that the Association's complaint failed to state any claims upon which relief could be granted. This appeal followed.
 
 II.
 
 8
 Initially, we must determine as a matter of law whether the Association's action is barred by the collateral estoppel effect of the consent decree entered by the court in Dodson v. Salvitti. We begin with the familiar principle set forth by Chief Justice Stone for the Supreme Court in Hansberry v. Lee, 311 U.S. 32, 61 S.Ct. 115, 85 L.Ed. 22 (1940):
 
 
 9
 It is a principle of general application in Anglo-American jurisprudence that one is not bound by a judgment in personam in a litigation in which he is not designated as a party or to which he has not been made a party by service of process. A judgment rendered in such circumstances is not entitled to the full faith and credit which the Constitution and statute of the United States prescribe, and judicial action enforcing it against the person or property of the absent party is not that due process which the Fifth and Fourteenth Amendments require.
 
 
 10
 311 U.S. at 40-41, 61 S.Ct. at 117 (citations omitted).
 
 
 11
 The Association and the individual plaintiffs here claim the benefit of this principle: they were not parties to the Salvitti suit, and they allege that the judgment there entered constitutes an adverse determination of various constitutional, statutory and regulatory rights that they possess. If not allowed to attack the legality of the Salvitti consent decree, they argue, they will have been denied due process of law.[4] See Consumers Union v. Consumer Product Safety Commission, 590 F.2d 1209, 1217-18, 1221 (D.C.Cir.1978) (requester of information under Freedom of Information Act not bound by judgment in reverse-FOIA suit to which it was not a party), rev'd on other grounds sub nom. GTE Sylvania, Inc. v. Consumers Union, 445 U.S. 375, 100 S.Ct. 1194, 63 L.Ed.2d 467 (1980).
 
 
 12
 The defendants invoke the strong interest in the finality of judgments to bar the collateral attack. They properly point out that if there were an unqualified right on behalf of persons not parties to a suit to relitigate the merits of the judgment by means of a second suit, the interest in finality would be seriously undermined. Thus, they rely on the district court decision in Oburn v. Shapp, 70 F.R.D. 549 (E.D.Pa.), affirmed without opinion by this court, 546 F.2d 418 (3d Cir. 1976), cert. denied, 430 U.S. 968, 97 S.Ct. 1650, 52 L.Ed.2d 359 (1977), for the proposition that a collateral challenge may not be raised in these circumstances.
 
 
 13
 We agree with the defendants that a concern for the finality of judgments demands some limitations on the availability of collateral attack. We also accept the balance struck in Oburn between the competing interests in finality and an individual's right not to be bound by the judgment in a case to which he was not a party. But, even applying the Oburn approach here, we find that due process demands that the Association be allowed its challenge, and that the district court erred in precluding it.
 
 
 14
 Oburn presented an attack on a consent decree entered in an earlier litigation in which Pennsylvania agreed to increase minority hiring and promotion in the state police. The plaintiffs in Oburn were unsuccessful white applicants to the state police, who alleged that the earlier consent decree infringed their federal and state constitutional rights. The district court held that the plaintiffs would not be allowed to collaterally attack the earlier decree.
 
 
 15
 In support of their position that a separate action is maintainable, plaintiffs have cited the Court to the case of Hansberry v. Lee, 311 U.S. 32, 61 S.Ct. 115, 85 L.Ed. 22 (1940). However, we find Hansberry to be inapposite to the cases before us. Hansberry stands for the proposition that a stranger to a prior suit, who lacks any opportunity to timely contest the validity of the final judgment rendered in that prior suit, may not be bound by the prior judgment, depending on the particular facts, if he would be deprived of the due process of law guaranteed by the Fifth and Fourteenth Amendments.
 
 
 16
 We cannot accept plaintiffs' proposition that Hansberry allows any third person an unqualified right to collaterally relitigate the merits of a judgment in a prior suit. Under such circumstances, courts could never enter a judgment in a lawsuit with the assurance that the judgment was a final and conclusive determination of the underlying dispute.
 
 
 17
 If the instant cases presented a situation wherein the plaintiffs had no alternative but to institute an independent lawsuit in order to challenge the Bolden consent decree, then their reliance on Hansberry might be appropriate. The instant cases do not present such a situation, because this Court continues to maintain jurisdiction over the Bolden consent decree. This factor of continuing jurisdiction is quite significant in view of plaintiffs' allegation that the Bolden consent decree was procured by a fraud on the court.
 
 
 18
 70 F.R.D. at 552 (footnote omitted), aff'd mem., 546 F.2d 418 (3d Cir. 1976), cert. denied, 430 U.S. 968, 97 S.Ct. 1650, 52 L.Ed.2d 359 (1977).
 
 
 19
 The distinction between the Oburn proceeding and the instant one is immediately apparent. In Oburn, the district court had retained jurisdiction over the earlier consent decree; thus, the Oburn plaintiffs could have had their day in court by moving to intervene in the very litigation in which the decree had been entered. This retention of jurisdiction is also present in the other decisions that have found collateral attacks impermissible in similar circumstances. See, e. g., Black and White Children of the Pontiac School System v. School District of the City of Pontiac, 464 F.2d 1030-31 (6th Cir. 1972); McAleer v. American Telephone & Telegraph Co., 416 F.Supp. 435, 438 (D.D.C. 1976). But here, this route is closed; the Salvitti court did not retain jurisdiction over the decree, and thus direct intervention is no longer available. The Association may only challenge the consent decree by instituting a separate lawsuit. Thus, if it is to receive the day in court that due process demands, its collateral attack must be allowed.
 
 
 20
 The defendants contend, however, that collateral attack is not the only way the Association can have its challenge entertained. They point out that under the terms of the consent decree, the parties retained their right to return to court to enforce the decree.[5] Thus, they claim that the Association can intervene if the parties should ever return to court to resolve disputes over enforcement.
 
 
 21
 This argument need not detain us long, for the defendants' suggestion does not guarantee the Association an opportunity to present its claims. If the parties to the Salvitti decree can carry out its terms amicably, they never will return to court for enforcement, and there will be no further litigation in which the Association could intervene. This speculative possibility of an opportunity for the Association to intervene at the enforcement stage falls far short of the opportunity to be heard on the substantive claims and the opportunity to be afforded "that due process which the Fifth and Fourteenth Amendments require." Hansberry v. Lee, 311 U.S. at 41, 61 S.Ct. at 118.
 
 
 22
 The district court here generally recognized the Association's right to be heard under Hansberry v. Lee. The court concluded, however, that the Association's failure to seek intervention in Dodson v. Salvitti precluded its later collateral attack. We agree with the district court that intervention is a far better course than subsequent collateral attack, if intervention is feasible. We further agree that an unjustified or unreasonable failure to intervene can serve to bar a later collateral attack. Unjustified failure to intervene would, for instance, bar a collateral attack by the group of property owners who had earlier sought to intervene in Salvitti. Those property owners were denied intervention in part on the grounds that they had delayed for two and a half years before bringing their motion to intervene. As the dissent points out, these property owners should not be allowed to escape the consequences of their own tardiness by recasting their motion for intervention as a complaint in a suit collaterally attacking the prior judgment. However, it is not these property owners who are before the court now.
 
 
 23
 The district court here precluded the Association's collateral attack for the same reason that it denied intervention to the other property owners in Dodson v. Salvitti. The court held that the Association had "been no less dilatory in asserting (its) claims (than) . . . the Dodson intervenors, (and) should have acted, if at all, as soon as it became apparent (that its) interests needed representing." But this conclusion was not one that the court could draw at this stage of the litigation. The Association made an allegation in its complaint, which must be accepted as true for purposes of a judgment on the pleadings, that would excuse its failure to file suit until the present time. The Association alleged that, despite its continuing negotiation with the tenants during the course of Dodson v. Salvitti, it did not know of the Dodson action until late 1976, and was never served with process. If this allegation is true, and we must accept it as such at this stage, the Association, on the present record with all inferences given in its favor, cannot be precluded from its present collateral attack on the ground that it unreasonably delayed in protecting its interests.[6] The Association's conduct following its discovery of the Dodson v. Salvitti litigation in late 1976, according it all reasonable inferences from the record, cannot be characterized as unreasonable delay in protecting its interests.
 
 
 24
 The Association acted promptly after the final denial of this motion to intervene, filing its own complaint in the instant suit in September, 1977.[7] Thus, giving the Association the benefit of all reasonable inferences from the facts, as we must at this stage in the litigation, it cannot be said that the Association delayed unreasonably in acting to protect its interests. Of course, on remand the district court is not bound to give the Association all reasonable inferences from the facts. Rather, the facts of the reasonableness of the Association's conduct can be developed more fully. Ultimately, the Association's right to maintain this suit will depend on the district court's findings, upon remand, as to when the Association became apprised of the Dodson v. Salvitti suit, and whether the issues raised in this case are similar to those raised by the proposed intervenors in Dodson and if, under all the circumstances, the Association delayed unreasonably in acting to protect its interests.
 
 III.
 
 25
 Assuming that the district court finds that the Association did not delay unreasonably in acting to protect its interests, and that its challenge must therefore be allowed, it remains to consider the legal sufficiency of the claims that the Association raises. In doing so, we suffer the disadvantage of having little discussion of these issues by the parties or the district court. The parties in their briefs concentrated on the question of the collateral estoppel effect of the Dodson v. Salvitti consent decree. They have provided us with virtually no illumination on subjects we find critical to the resolution of this case-the Association's standing, its entitlement to seek judicial review of HUD's action in committing itself to the consent decree, or the actual substantive merits of its claims. The district court, apparently faced with a similar situation, understandably did not dwell on these aspects of the suit. The district court's primary ruling was that the Association's complaint, since it sought impermissibly to attack a valid judgment, could not be entertained. Thus, on this ground the district court dismissed the suit. It was only after it had done so that the district court alternatively stated that "(i)n view of this ruling, it is unnecessary for me to examine the sufficiency of each and every averment in the complaint. However, I would point out that I think the averments of the complaint are untenable and do not state a cause of action." (98a). With relatively little additional discussion of the merits, the district court then entered its order dismissing the complaint pursuant to Fed. R. Civ. P. 12(c).
 
 
 26
 Under Rule 12(c), like Rule 12(b)(6) (dismissal for failure to state a claim upon which relief can be granted), judgment will not be granted
 
 
 27
 unless the movant clearly establishes that no material issue of fact remains to be resolved and that he is entitled to judgment as a matter of law. In considering a motion for judgment on the pleadings, the trial court is required to view the facts presented in the pleadings and the inferences to be drawn therefrom in the light most favorable to the nonmoving party. In this fashion the courts hope to insure that the rights of the nonmoving party are decided as fully and fairly on a rule 12(c) motion, as if there had been a trial.
 
 
 28
 5 C. Wright & A. Miller, Federal Practice and Procedure, § 1368, at 690 (1969) (footnotes omitted). Thus, our task is to determine whether any of the allegations made by the Association can survive a Rule 12(c) motion, under the standard set forth above. In discharging this task, we have the benefit of the pleadings alone, with little additional analysis by the parties or the district court. Nevertheless, we believe that at least some of the Association's claims state a cause of action as a matter of law, and thus could not be dismissed in the instant Rule 12(c) proceeding.
 
 A.
 
 29
 The Association claims, for instance, that the Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970 (the Relocation Act), on which the tenants in Dodson v. Salvitti principally based their right to relief, does not permit the construction of new housing for the purpose of relocating displaced persons unless no suitable existing housing is available. Postponing for the moment consideration of the substantive merits of this allegation, we shall address briefly two preliminary matters concerning the Association's right to raise this issue.
 
 
 30
 The first aspect of the Association's right to challenge the consent decree on this ground is the requirement of standing. In order to have standing to sue, the Association must demonstrate an "injury in fact" to an interest "arguably within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question." Association of Data Processing Service Organizations v. Camp, 397 U.S. 150, 152-53, 90 S.Ct. 827, 830, 25 L.Ed.2d 184 (1970); Americans United for Separation of Church and State v. United States Department of Health, Education and Welfare, 619 F.2d 252, at 256 (3d Cir. 1980).
 
 
 31
 The allegation that the construction of the proposed housing will cause a substantial diminution in property values on Society Hill is sufficient to satisfy the injury in fact component of standing. We are also satisfied that the Association's interest is arguably within the zone of those protected by the Relocation Act. While perhaps not its principal focus, the Act may be construed as reflecting an intent that relocation of persons displaced by federal projects shall be carried out in a manner that entails the minimum disruption of neighborhoods. Thus, the Act prescribes that displaced persons shall be relocated in existing housing before the government shall construct new housing for them. We thus find that the Association has standing to raise this claim of a violation of the Relocation Act.[8] Cf. Shannon v. United States Department of Housing & Urban Development, 436 F.2d 809, 817-18 (3d Cir. 1970) (residents of area in which housing project was built have standing to assert claim that project will increase high concentration of low income blacks in area).
 
 
 32
 The second aspect of the Association's right to complain of a violation of the Relocation Act is whether there exists a "cause of action" in the Association's behalf, i. e., whether the Association is "a member of the class of litigants that may, as a matter of law, appropriately invoke the power of the court" to enforce the Act's limitations. Davis v. Passman, 442 U.S. 228, 240 n.18, 99 S.Ct. 2264, 2274, 60 L.Ed.2d 846 (1979). Where a party seeks to challenge the legality of the acts of a federal administrative agency, the "cause of action" element is more commonly referred to as a right to seek judicial review of the agency action. This right to judicial review is broadly conferred by the Administrative Procedure Act (APA), which provides in pertinent part that "A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof." 5 U.S.C. § 702 (1976). The limitation that a party be "adversely affected or aggrieved" embodies the requirement of standing to sue, a requirement that, as discussed above, the Association satisfies.
 
 
 33
 The Administrative Procedure Act contains two significant limitations on the availability of judicial review of agency action that must be considered before concluding that the Association may complain of a violation of the Relocation Act. 5 U.S.C. § 701(a) (1976) states that:
 
 
 34
 This chapter (providing for judicial review of agency action) applies, according to the provisions thereof, except to the extent that-
 
 
 35
 (1) statutes preclude judicial review; or
 
 
 36
 (2) agency action is committed to agency discretion by law.
 
 
 37
 In considering the application of these limitations to the Association's claim, we heed the Supreme Court's oft-repeated directive that the APA's "generous review provisions must be given a hospitable interpretation," and that "only upon a showing of clear and convincing evidence of a contrary legislative intent should the courts restrict access to judicial review." Abbott Laboratories v. Gardner, 387 U.S. 136, 141, 87 S.Ct. 1507, 1511, 18 L.Ed.2d 681 (1967) (internal quotations omitted). See, e. g., Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402, 410, 91 S.Ct. 814, 820, 28 L.Ed.2d 136 (1971); Association of Data Processing Service Organizations v. Camp, 397 U.S. 150, 156-57, 90 S.Ct. 827, 831, 25 L.Ed.2d 184 (1970); Local 2855, American Federation of Government Employees v. United States, 602 F.2d 574, 578 (3d Cir. 1979).
 
 
 38
 It is plain that the first limitation in the APA statutory preclusion of judicial review, is inapplicable here. The Relocation Act contains no such preclusion, and neither does any other statute to which we have been directed, although, as we have pointed out, the parties have not been generous in their assistance in this regard.
 
 
 39
 It is equally clear that the second limitation, "agency action . . . committed to agency discretion," is also inapplicable. The Supreme Court has held that "(t)his is a very narrow exception" that "is applicable in those rare instances where statutes are drawn in such broad terms that in a given case there is no law to apply." Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402, 410, 91 S.Ct. 814, 820, 28 L.Ed.2d 136 (1971) (quoting legislative history of the APA; internal quotations omitted). This is not such a case. The Relocation Act specifies in unambiguous terms, as is described in more detail below, the circumstances under which new housing may be constructed for persons displaced by federal projects. There is little left to agency discretion in making the choice between relocating displaced persons into existing housing or newly constructed housing. See 42 U.S.C. §§ 4624 & 4626 (1976) discussed and quoted infra.
 
 
 40
 We thus conclude that neither of the APA's limitations on review are applicable here, and that the Association is entitled to invoke the power of the courts to determine the legality of HUD's action in committing itself to fund the new housing described in the consent decree.
 
 
 41
 The APA defines the scope of review of agency action. 5 U.S.C. § 706(2) sets forth six grounds upon which a reviewing court shall "hold unlawful and set aside agency action, findings, and conclusions." Subsection (C) of § 706 is particularly applicable to the claim that HUD could not build replacement housing for the tenants because adequate existing housing is available. This subsection provides that a court shall set aside agency action that is "in excess of statutory . . . authority." The Association claims that the Relocation Act and HUD's regulations have been violated. Thus, it contends that HUD's commitment to build replacement housing for the tenants was "in excess of statutory authority."
 
 
 42
 In support of this claim, the Association relies on 42 U.S.C. §§ 4624 & 4626 (1976), which regulate the construction of new housing for displaced persons, and specify that only as a last resort may such new housing be constructed. Section 4624 provides for payments to displaced tenants for the rental or purchase of existing dwellings comparable to those from which they were displaced.[9] Section 4626 provides for new construction to house displaced persons when suitable existing housing is not available. This section states in pertinent part:
 
 
 43
 § 4626. Housing replacement by Federal agency as last resort
 
 
 44
 (a) If a Federal project cannot proceed to actual construction because comparable replacement sale or rental housing is not available, and the head of the Federal agency determines that such housing cannot otherwise be made available he may take such action as is necessary or appropriate to provide such housing by use of funds authorized for such project.
 
 
 45
 42 U.S.C. § 4626 (1976).
 
 
 46
 A HUD regulation likewise specifies that, with certain exceptions, new housing may only be erected as a last resort. This regulation provides:
 
 
 47
 New construction projects shall be permitted only where: (1) HUD determines that there is not and there is not likely soon to be an adequate supply of existing housing which, with the aid of housing assistance payments provided under the Section 8 Housing Assistance Payments Program Existing Housing, can meet the needs of Eligible Families, or (2) the proposed project is specifically approved by HUD in accordance with the priorities established from time to time by the Secretary including priorities for New Communities.
 
 
 48
 24 C.F.R. § 880.103(a) (1979) (emphasis added).
 
 
 49
 The Association alleged in its complaint that there is adequate existing housing in the neighborhood to accommodate the displaced tenants, and in effect claimed that the project had not been specifically approved in accordance with established priorities. It therefore urges that HUD's agreement to provide new housing for the tenants violated the Relocation Act and HUD's own regulations.[10] This allegation was denied in the answers filed by the various defendants. Thus, as we interpret the Association's argument, it is that while HUD may well be able to provide payments to the displaced tenants for their relocation into existing housing,[11] HUD cannot support new construction under the Relocation Act in circumstances in which the Act precludes new construction. These allegations are sufficient to state a claim on which relief may be granted. Indeed, if proved, these allegations may entitle the Association to an injunction which, among other things, would require HUD to comply with the Relocation Act and its own regulations. We conclude therefore that it was error to dismiss this claim made by the Association, pursuant to Fed.R.Civ.P. 12(c).
 
 B.
 
 50
 A second claim of the Association that we believe survives a motion for judgment on the pleadings is its contention that the new housing currently contemplated will not be in compliance with applicable zoning regulations. HUD regulations provide that preliminary proposals for new construction must include
 
 
 51
 (h) Evidence that the proposed construction is permissible under applicable zoning ordinances or regulations, or a statement of the proposed action to make the construction permissible and the basis for belief that such action will be successfully completed prior to submission of the architect's certification pursuant to Sec. 880.211(b) (i. e. a summary of results of any recent requests for rezoning on land in similar zoning classifications and the time required for such rezoning, preliminary indications of acceptability from zoning bodies, etc.).
 
 
 52
 24 C.F.R. § 880.205(h) (1979). A similar provision is included in the requirements for final proposals. See 24 C.F.R. § 880.209(a)(13) (1979).
 
 
 53
 The consent decree itself could not, and does not, specifically authorize HUD to fund housing that does not comply with the local zoning ordinances. Nor does the decree describe in any detail the housing to be constructed. Had the above regulation never been promulgated, then, we might well be inclined to conclude that the Association's complaint as to this issue was not ripe for adjudication at this time. Such an issue could more properly be determined only after the plans for the housing were finally approved, so that any inconsistency between the plans and the zoning code could be demonstrated. However, the regulation set forth in text above imposes on HUD an obligation to demand proof of conformity with the zoning code even in preliminary proposals. Thus, the regulation creates an obligation that exists now, since, according to the representations of counsel at oral argument, HUD has given preliminary approval to a proposal.
 
 
 54
 The Association, having alleged that the consent decree contemplates placing multifamily housing on property currently zoned for single family residences, and that the proposed housing violates the zoning ordinances in other respects, has thus made allegations sufficient to survive a motion for judgment on the pleadings. For the reasons which we have discussed heretofore with respect to the claim that the consent decree violated the Relocation Act by authorizing new construction when there was adequate existing housing, we believe that the Association also has standing to raise this zoning claim and is entitled to seek judicial review of HUD's action in committing itself to this housing project. Thus, on a motion under Rule 12(c), it was error to dismiss the Association's claim that HUD had failed to comply with its regulations requiring proof of compliance with zoning ordinances.[12]
 
 C.
 
 55
 In addition to the two claims discussed above, which we have concluded survive a Rule 12(c) motion, the Association has raised a great variety of other legal challenges to the consent decree.[13] At least two of these claims are similarly inappropriate for judgment on the pleadings. We refer to the claims: that HUD compelled RDA to consent to the decree, and thereby impermissibly interfered with site selection decisions by local authorities, in violation of the Housing and Community Development Act of 1974, 42 U.S.C. § 5301 et seq. (1976); and, that the decree commits HUD to a change in its Urban Renewal Plan for Philadelphia without compliance with the administrative procedures that must attend such a change. We hold that the Association has standing to bring both of these claims, is entitled to invoke the power of the courts to enforce the statutory standards, and may, under an appropriate set of facts, be entitled to relief. We therefore remand these claims to the district court for further proceedings consistent with this opinion.
 
 D.
 
 56
 In holding that the four claims[14] discussed above may not be disposed of by judgment on the pleadings under Rule 12(c), we express no view on their ultimate merit. Nor do we hold that they inevitably require a plenary trial in the district court. Judgment on the pleadings, as noted above, requires the trial court "to view the facts presented in the pleadings and the inferences to be drawn therefrom in the light most favorable to the nonmoving party." 5 C. Wright & A. Miller, Federal Practice and Procedure, § 1368, at 690 (1969). Summary judgment under Fed.R.Civ.P. 56, of course, does not. It may appear, on an appropriate summary judgment record, that the Association cannot sustain the factual predicate for these claims, and that summary judgment can be entered for the defendants on some or all of these claims. Nothing we have said here precludes such a result. We only hold that, taking the allegations of the complaint as true, the defendants have not shown themselves to be entitled to judgment as a matter of law. The district court remains free to determine the Association's contentions through whichever procedure, summary judgment or plenary trial, the circumstances require.
 
 IV.
 
 57
 As to the remainder of the claims made by the Association, we hold that the district court did not err in entering judgment for the defendants on the pleadings. Four claims were properly dismissed on the ground that they do not state claims on which relief can be granted.
 
 
 58
 First, the Association claims that construction of the new housing will depress property values on Society Hill and thereby deprive homeowners of property without due process of law. We agree, however, with the Court of Appeals for the Sixth Circuit that a decline in property value flowing solely from a governmental program of urban renewal to improve the living conditions for the disadvantaged cannot constitute a due process taking. See Sayre v. City of Cleveland, 493 F.2d 64, 69(6th Cir.), cert. denied, 419 U.S. 837, 95 S.Ct. 65, 42 L.Ed.2d 64 (1974).
 
 
 59
 Two other contentions that likewise fail to state claims upon which relief can be granted are that the Dodson v. Salvitti court was without subject matter jurisdiction to enter the consent decree because the parties to that suit were not truly adverse and, as a result, the constitutionally required case or controversy was absent; and, that the decree unlawfully extends relief to parties not before the district court. These claims fail because a consent decree can only be attacked on the ground that its substantive provisions unlawfully infringe the rights of the complainant. If HUD and RDA could lawfully take the actions that they bound themselves to take, without infringing the rights of the present plaintiffs, it is an insufficient response that the court that entered the decree lacked subject matter jurisdiction, or that the decree benefits parties not present in the litigation underlying the decree. Those contentions, by themselves and without charges of substantive illegality, do not constitute allegations of violations of the rights of the Association. Thus, they provide no basis for affording the Association any relief. See United States v. City of Miami, 614 F.2d 1322 at 1329 (5th Cir. 1980) (consent decree cannot be challenged by a party whose rights are not affected by it).
 
 
 60
 A fourth claim fails as a result of a subsequent change in the law. The Association claims that the consent decree's twenty year limitation on the new housing for use by tenants of low and moderate income is in violation of 24 C.F.R. § 880.109(a) (1979), which limits federal housing assistance payments contracts to initial terms of no more than five years, renewable at the sole option of the owner of the housing. In the Housing and Community Development Amendments of 1979, however, Congress raised the minimum permissible length of a housing assistance payments contract from one month to twenty years. 42 U.S.C.A. § 1437f(e)(1) (Supp.1980). Thus, the regulation that limits initial contract terms to five years has effectively been modified by Congress. Initial contract terms of twenty years are not only permissible, but mandatory. The Association, then, has no basis for challenging the twenty year covenant in the consent decree.
 
 
 61
 Two other claims were properly dismissed on the ground that they are premature for adjudication at this time.
 
 
 62
 First, the Association claims that the consent decree is unlawful because it fails to require the preparation of an environmental impact statement, thereby violating the National Environmental Policy Act of 1969, 42 U.S.C. § 4321 et seq. (1976). The consent decree itself, however, cannot be challenged on these grounds. The decree does not, of course, authorize construction of the housing without compliance with the Act; it simply makes no reference to the requirements of that statute. A consent decree need not in explicit terms require that the actions specified therein shall be carried out in conformity with all applicable federal, state and local law. It is sufficient if it does not authorize or require conduct in violation of the law. If HUD should carry this project forward to the point where an impact statement would be required (and we express no opinion that one would be), HUD's refusal to prepare such a statement (if HUD refuses), or the adequacy of any statement that it does prepare, may be challenged in court at that time. But the consent decree's failure explicitly to require compliance with the Environmental Policy Act is no basis for attacking the decree itself.
 
 
 63
 A second claim premature for adjudication at this time is the Association's contention that the decree fails to ensure that the project's developer has the ability successfully to complete and manage the project, as required by 24 C.F.R. § 880.208(a)(5) (1979). This claim fails for the same reason set forth above. The decree does not authorize selection of a developer who does not satisfy the requirements of this regulation; it merely makes no mention of these requirements. If a developer is selected who is unsatisfactory under the regulation, that selection may be challenged at that time. But the consent decree's silence on this point is no basis for challenging the decree itself.
 
 
 64
 Several other claims were properly dismissed on the ground that the Association, for various reasons, has no standing to bring them. First, the Association claims that the Dodson v. Salvitti court was without jurisdiction because the issues involved had already been determined in the earlier Octavia Hill litigation, and that the Salvitti suit was thus barred by the doctrine of res judicata. It is true, as the Association argues, that both of those actions concerned the tenants' relocation rights under federal law, and that the predicate for a claim of res judicata is there. But the protection of the res judicata defense runs only to the defendants in the Salvitti suit. Those defendants may well have been able to avoid the suit by claiming that the relocation rights granted in Octavia Hill exhausted the tenants' ability to sue for such rights. The Salvitti defendants, however, chose not to raise this defense. The Association cannot now complain of this waiver by the Salvitti defendants; it was the defendants' choice to make, not the Association's. Nor is this result altered by the Supreme Court's relaxation of the requirement of mutuality of estoppel. See Blonder-Tongue Laboratories, Inc. v. University of Illinois Foundation, 402 U.S. 313, 91 S.Ct. 1434, 28 L.Ed.2d 788 (1971). The relaxation of the mutuality requirement allows a defendant against whom substantive liabilities are asserted to avail himself of a judgment against the plaintiff when the plaintiff asserted the same liabilities against a different defendant.[15] But it does not allow a party not charged with substantive liabilities to invoke the res judicata defense on behalf of a defendant who is so charged, when that defendant himself chose to forego it. Res judicata is in this sense a personal defense; it does not run to a party in the position of the Association in this case.
 
 
 65
 A second claim that the Association has no standing to raise is that the consent decree contravenes the equal protection clause by providing relief to certain parties without providing the same relief to other persons in similar circumstances. The Association does not claim that its members are entitled to the relief granted. Thus, it seeks here to assert rights possessed only by other individuals. It has no standing to do so.
 
 
 66
 The Association next complains that the National Housing Act of 1949, 42 U.S.C. § 1441 et seq. (1976), under which the property for the project will be acquired, provides an unconstitutionally vague standard for determining the price to be paid. The Act provides that property shall be leased or purchased from the government at "fair value." 42 U.S.C. § 1457(a) (1976). While we do not doubt that the term "fair value" means market value, and thereby survives any vagueness challenge,[16] it is also clear that the Association cannot complain of this vagueness. The only persons who might suffer a cognizable injury in fact as a result of the "vagueness" are developers seeking to lease or purchase property under the statute. The only interest that the Association can assert in this context is the taxpayer interest of its members, who may be concerned to ensure that the government does not lease or sell property at too low a price. Such an interest does not confer standing to sue. See Flast v. Cohen, 392 U.S. 83, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968); Frothingham v. Mellon, 262 U.S. 447, 43 S.Ct. 597, 67 L.Ed. 1078 (1923).
 
 
 67
 Three remaining claims also fail because the Association can only assert the taxpayer interest of its members as a basis of standing. The Association claims that the consent decree contemplates housing more luxurious than is permissible under 24 C.F.R. § 880.102 (1979); that the cost of the contemplated housing contravenes the congressional intent in the National Housing Act of 1949, 42 U.S.C. § 1441 et seq. (1976), not to exhaust federal housing funds on unreasonably expensive projects; and that the price that will be paid for the property by the developer is not "reasonable," as required by 24 C.F.R. § 880.203(e)(1)(ii) (1979). The essence of these claims is simply that the government is spending money unlawfully, or selling property at an unlawfully low price, thereby improperly impairing the national fisc. The Association's members' interest as taxpayers does not confer standing to sue. See Flast v. Cohen, 392 U.S. 83, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968); Frothingham v. Mellon, 262 U.S. 447, 43 S.Ct. 597, 67 L.Ed. 1078 (1923).
 
 V.
 
 68
 We hold that the district court, on the present record, erred in concluding that the Association could not challenge the Dodson v. Salvitti consent decree under the circumstances presented here. We also hold that, on this record, it was inappropriate to dispose of several of the Association's claims by judgment on the pleadings, inasmuch as they state claims upon which relief may be granted. As to the Association's right to maintain this action, and as to the claims that we hold to be inappropriate for judgment on the pleadings, we will reverse and remand for further proceedings before the district court. Costs will be taxed against the appellees.
 
 
 69
 SLOVITER, Circuit Judge, dissenting.
 
 
 70
 In its decision holding that a neighborhood civic association and some of its members may be able to challenge a consent decree after other neighborhood residents failed in their attempt to make essentially the same challenges in prior litigation, the majority has undermined the fundamental principle of finality of judgments. Therefore I dissent.
 
 
 71
 Dodson v. Salvitti was an action filed on July 26, 1974 against the Redevelopment Authority of the City of Philadelphia and the United States Department of Housing and Urban Development and some of their officers. The plaintiffs, tenants of property which was being redeveloped, claimed that defendants failed to perform their statutory and constitutional duty to provide permanent replacement housing for them in a manner which would affirmatively promote racial integration. On January 13, 1977, two and one-half years after the inception of the action, 20 residents of the neighborhood sought to intervene, claiming intervention of right under Fed.R.Civ.P. 24(a)(2). Plaintiffs opposed the intervention on the grounds, inter alia, that the interest of the proposed intervenors was not adequately identified, and that the "intervenors have not demonstrated how their ill-defined interest in this action may be impaired if they are not allowed to intervene." On February 7, 1977, the district court denied the motion to intervene. The proposed intervenors' response to the plaintiffs' memorandum in opposition was not filed until two weeks after the court's order.
 
 
 72
 On March 4, 1977 the same 20 residents again moved to intervene in order that their response to the opposition could be considered by the court. Their second motion to intervene alleged that they sought to "protect an economic interest in the value of their homes" which would be injured by building government subsidized homes near their property. Intervention was again opposed not only by the plaintiffs but this time also by the federal defendants, all of whom again asserted the proposed intervenors did not satisfy the requirements of Rule 24(a)(2) because they did not have a legally protectible interest. They also alleged that the intervention request was untimely because "it was unreasonable to believe that proposed intervenors were unaware of (the case) until recently, particularly in light of the media coverage received by this case and its predecessors." Memorandum of Federal Defendants in Opposition to (Renewed) Motion to Intervene as Defendants at 3. This second motion to intervene was denied by the district court who held that intervention by the proposed intervenors was not warranted both because they "failed to assert an interest in the lawsuit sufficient to warrant intervention as of right" and because their motion was untimely. In connection with the latter holding the court ruled:
 
 
 73
 (T)he proposed intervenors in this case knew or should have known from the time this litigation was commenced that the ultimate disposition of these proceedings might well effect the interests which they now seek to protect. Nonetheless, they chose to remain inactive and ignored this litigation until approximately two and one half years after its commencement, long after various alternative settlement possibilities had been fully explored. Finally, any claim on the part of these proposed intervenors that their dilatory action in regard to this litigation was the result of their belief that their claimed interests were being protected by defendants is untenable. There is simply no duty on the part of any of the defendants to protect against the alleged effect that the settlement agreement will have upon the interests claimed by these proposed intervenors.
 
 
 74
 Dodson v. Salvitti, 77 F.R.D. 674, 677 (E.D.Pa.1977).
 
 
 75
 On appeal by the proposed intervenors, this court affirmed the action of the district court, and the Supreme Court of the United States denied their application for a writ of certiorari, and their subsequent request for rehearing. 571 F.2d 571 (3d Cir.) (memorandum decision), cert. denied, 439 U.S. 883, 99 S.Ct. 222, 58 L.Ed.2d 195, reh. denied, 439 U.S. 998, 99 S.Ct. 604, 58 L.Ed.2d 673 (1978). On September 16, 1977, the district court approved a consent decree entered into between the parties to the litigation which required the construction of 14 to 18 low-income housing units in or near the center of the Society Hill area to house the displaced tenants.
 
 
 76
 The group of neighborhood residents who opposed the subsidized low income housing which allegedly would contribute to racial integration in the neighborhood persisted in their efforts to halt construction of those units. Using the same counsel and alleging essentially the same claims which the proposed intervenors sought to assert in the Dodson suit, they filed the suit sub judice, this time denominating as plaintiffs the Society Hill Civic Association and 13 residents of the neighborhood, none of whom had previously joined the motions to intervene in Dodson. The same government agencies are named as defendants along with their current officers. Four of the original Dodson plaintiffs moved for and were granted leave to intervene as defendants.
 
 
 77
 This suit was assigned to the same district judge who had presided over the proceedings in Dodson and who was therefore intimately familiar with the circumstances surrounding the proposed intervention. Following completion of the pleading stage, the court granted defendants' motion for judgment on the pleadings. The court relied on "the doctrine that a judgment entered in a court is normally not subject to collateral attack" and held that since Society Hill Civic Association and its co-plaintiffs failed to assert their interests in the Dodson litigation although they either knew or should have known that their interests were at stake, they could not collaterally attack the Dodson judgment.
 
 
 78
 Initially, I note that even under the majority's view that the dismissal should be overturned and the case remanded, I see no justification for the majority's treatment of the merits of plaintiffs' claims, which the majority admits the parties have not illuminated in their briefs. Typescript Op. at 14. In reading the record of the judge's ruling on the motion to dismiss which was delivered orally, it is apparent that the judge dealt with the legal sufficiency of the claims as a subsidiary matter. After devoting more than 17 of the 21 pages of transcript to the collateral attack issue, the judge stated, "In view of this ruling, it is unnecessary for me to examine the sufficiency of each and every averment in the complaint." The judge then briefly commented on his views of the merits of some of the claims which were asserted in the complaint. In spite of the fact, as the majority admits, that it has "virtually no additional analysis by the parties" beyond the pleadings, it nonetheless embarks on a determination of complex statutory issues. I believe this is inappropriate, particularly in light of the fact that the district court may determine on remand that the plaintiffs did in fact delay unreasonably in failing to file a timely motion to intervene. Since the district court may never reach the merits, I see no reason for the majority to have done so.
 
 
 79
 In holding that plaintiffs may be able to collaterally attack a final judgment, the majority appears to have accepted appellants' claim that they are not bound by the Dodson consent decree because they were not parties to that suit. Appellants relied on the language of the decision in Hansberry v. Lee, 311 U.S. 32, 40, 61 S.Ct. 115, 117, 85 L.Ed. 22 (1940), "that one is not bound by a judgment in personam in a litigation in which he is not designated as a party or to which he has not been made a party by service of process." If that were in fact the black letter law which it appears to be, then, of course, the trial court would have been in error in holding that appellants were not free to reassert claims resolved by the consent decree in the prior litigation.
 
 
 80
 There are several well-established exceptions to the general principle that nonparties are not precluded by prior litigation. The most well-recognized exception is that which has traditionally been referred to as affecting persons who are in "privity" with the parties to the prior litigation, leading to the formulation of the res judicata rule: "A person who is not a party but who is in privity with the parties in an action terminating in a valid judgment is . . . bound by and entitled to the benefit of the rules of res judicata." Restatement of Judgments § 83 (1942). See United States v. Moser, 266 U.S. 236, 241, 45 S.Ct. 66, 67, 69 L.Ed. 262 (1924); Southern Pacific R.R. v. United States, 168 U.S. 1, 48-49, 18 S.Ct. 18, 27, 42 L.Ed. 355 (1897); Mid-Continent Casualty Co. v. Everett, 340 F.2d 65, 69 (10th Cir. 1965). The traditional definition of a "privy" was one who claimed an interest in the subject-matter affected by the judgment through or under one of the parties, i. e. either by inheritance, succession or purchase, and was restricted to situations involving transfer of property. See M. Rosenberg, J. Weinstein, H. Smit, H. Korn, Elements of Civil Procedure 1129 (3d ed. 1976). This technical view of privity has given way to a more pragmatic approach, one looking to the relationship between the nonparty and the party to determine whether the judgment involving the party may justly be conclusive upon the one who is not a party. See F. James & G. Hazard, Civil Procedure 576 (2d ed. 1977) (hereinafter James & Hazard). See also, Developments in the Law-Res Judicata, 65 Harv.L.Rev. 818, 855-56 (1952). As stated by the late Judge Goodrich, "privity" is "merely a word used to say that the relationship between the one who is a party on the record and another is close enough to include that other within the res judicata." Bruszewski v. United States, 181 F.2d 419, 423 (3d Cir.) (concurring), cert. denied, 340 U.S. 865, 71 S.Ct. 87, 95 L.Ed. 632 (1950).
 
 
 81
 Plaintiffs in this litigation have never asserted that they were not in privity with the proposed Dodson intervenors. On the contrary, they admit that they were in "privity." As previously noted, counsel for plaintiffs-appellants in this case represented the proposed intervenors in the Dodson case. In the brief of plaintiffs-appellants filed in this court in this case, they make the candid admission as follows: "Appellants are in privity of interest only with those who have previously sought to participate in the litigation. That includes their neighbors and members of the Society Hill Civic Association." Brief for Appellants at 12 (emphasis added). At the oral argument before this court, the following colloquy took place:
 
 
 82
 Judge Rosenn: Mr. Lowrey I'm not sure that I heard you a moment ago. Did I understand you to say that you do concede that the parties are in privity with the parties in the Dodson case?
 
 
 83
 Lowrey: I think they are in a sense. They all live in the same neighborhood. They have virtually identical interests. If the parties in the Dodson case had been permitted to intervene in that litigation and had they lost on the merits, I would not have brought another lawsuit for them because I would have regarded that as a preclusion of any further litigation of the matter. Everybody couldn't intervene in the Dodson case.
 
 
 84
 Later in the argument, counsel admitted that the substantive claims he raised in the Dodson case were essentially the same raised in this suit.
 
 
 85
 It follows from this admitted privity relationship that if the proposed intervenors in Dodson would have been precluded by virtue of the Dodson judgment from bringing this lawsuit, then plaintiffs also must be precluded from bringing this lawsuit. Inexplicably, the majority never deals with the admission of privity, nor does it ever suggest that the Dodson plaintiffs could have renewed their challenge to the government subsidized housing by filing a new suit following our rejection of their claim that they had a right to intervene in the prior suit. Even the majority concedes that judgments must have some finality, at least as to the proposed albeit unsuccessful intervenors.
 
 
 86
 The second category of established exceptions to the rule that only parties will be bound by a judgment arises when the nonparty's interest has been represented by another who is authorized to act as a party on his or her behalf. This is closely related to the contemporary view of privity. Representation, for this purpose, is not limited to instances where there has been an express authorization to act on behalf of the nonparty. The appropriate question to be posed is whether the relationship between the person who was a party and the person whom s/he is treated as representing is such that the absentee's interests can be regarded as having been fairly represented by the party. James & Hazard, at 575. In this case, the reply is evident. Counsel for the two groups of litigants is the same; the interest they assert is the same; the claims they assert are identical. Thus, there is no reason why the same claim preclusion applicable to the Dodson proposed intervenors should not be applied to plaintiffs.
 
 
 87
 This reasoning has been used to preclude members of a trade association from asserting the invalidity of an Interstate Commerce Commission refund order that had previously been challenged unsuccessfully by other members of the same trade association. In rejecting the attempt of the carriers in the second litigation to claim that the Commission's refund order was entered in excess of its jurisdiction, the Seventh Circuit commented:Admittedly, some of the defendant-carriers whose appeals have been consolidated with the instant appeal were not named plaintiffs in the Colorado action and thus an argument might be made that, as to them, res judicata does not apply. However, as argued by the plaintiff-appellee, those defendant-carriers who were not named plaintiffs in the Colorado proceedings were undoubtedly in privity with the 60 named carrier-plaintiffs, particularly since all of the carriers involved were members of the Middlewest Motor Freight Bureau, Inc., and therefore are still bound under the doctrine of res judicata.
 
 
 88
 Aluminum Co. of America v. Admiral Merchants Motor Freight, Inc., 486 F.2d 717, 720-21 (7th Cir.), cert. denied, 414 U.S. 1113, 94 S.Ct. 843, 38 L.Ed.2d 739 (1973) (footnotes omitted).
 
 
 89
 Thus even a challenge that went to the jurisdictional authority of the order being enforced against a nonparty was held to be precluded. Although the Seventh Circuit termed the relationship between the first and second group of carriers to have been one of "privity", this was not privity in the narrow sense but instead appears to have been a description of a relationship between party and nonparty based on representation of the nonparty's interests.
 
 
 90
 Under either of these two categories of exceptions to the nonpreclusion of nonparty rule, these plaintiffs would be precluded from attacking the prior judgment. Even in the absence of either "privity" or representation by a party, nonparties may be precluded by a prior judgment if it is equitable to do so. The grounds for equitable preclusion have been described by Professors James and Hazard as follows:
 
 
 91
 There are numerous and diverse decisions that have denied opportunity to maintain an action or grounds not coming within any of the rules of preclusion so far discussed. They involve the following circumstances: (1) There had been a prior action involving the same claim or affecting the same property as is involved in the second action; (2) The party seeking to maintain the second action knew of the first action and could then have asserted the claim he now seeks to assert, either by intervening in the first action or by bringing in as a (party) thereto the person against whom he now asserts his claim; (3) The person against whom the claim is asserted in the second action was apparently relying on the first action to be dispositive of the controversy out of which the claim arises; and (4) The party asserting the claim in the second action knew, or reasonably should have known, of that reliance.
 
 
 92
 James & Hazard, at 598. Each of the circumstances is present in this case, since the prior action affected the same claim as plaintiffs sought to assert here; plaintiffs could have asserted their claim by a timely motion to intervene; plaintiffs concededly knew of the action before its final termination; the parties settled the Dodson action in the justifiable belief that no further litigation was contemplated by silent bystanders following the Supreme Court's denial of certiorari from our order affirming the denial of intervention, and plaintiffs should have been aware of that reliance.
 
 
 93
 Equitable preclusion is a concept particularly appropriate for use in cases involving social policy issues or statutes. The older and traditional concept of res judicata evolved in a society where most litigation occurred in the context of a single claim and single parties. As social welfare programs have expanded and statutes have been enacted giving rights to broad groups of persons, the judicial process has accommodated that change by expanding the concept of claim preclusion. One of the most widely used mechanisms shaped for that purpose is, of course, the class action. In this case, however, the proposed intervenors in Dodson carefully sidestepped that procedure by moving to intervene only on their own behalf. In that manner, they may have hoped to avoid the preclusive effect of any adverse judgment, whether on their intervention motion or on the merits, leaving it to another group of neighbors to be free to assert the same claims another time.
 
 
 94
 In similar circumstances, courts have been keenly sensitive to the need for insuring the finality of consent decrees aimed at affording relief to victims of racial or employment discrimination. In Smith v. Missouri Pacific Railroad Co., 615 F.2d 683 (5th Cir. 1980), the Fifth Circuit affirmed a district court's denial of a Rule 60(b) motion brought by white employees seeking to attack a consent agreement affording relief to black employees claiming employment discrimination. The court noted that the white employees brought the motion two years after settlement after failing to attempt intervention during that period. It stated, "There must be an end to litigation at some point. It would defeat both the aim of finality and the integrity of the settlement process in civil rights actions if this action could be revived and the settlement reevaluated at any time by any person-party or nonparty-who felt aggrieved . . . ." Id. at 685. See also, Thaggard v. City of Jackson, 618 F.2d 272 (5th Cir. 1980) (per curiam) (dismissal of reverse discrimination suits challenging hiring and promotional practices of city as impermissible collateral attack against two lawfully entered consent decrees); Dennison v. City of Los Angeles Department of Water and Power, 22 EPD P 30,575, 21 FEP 1120 (C.D.Cal.1979) (court dismissed as impermissible collateral attack a suit challenging consent decree calling for increased minority hiring to achieve racial balance); Prate v. Freedman, 430 F.Supp. 1373, 1374-75 (W.D.N.Y.), aff'd mem., 573 F.2d 1294 (2d Cir. 1977), cert. denied, 436 U.S. 922, 98 S.Ct. 2274, 56 L.Ed.2d 765 (1978).
 
 
 95
 It should be emphasized that there is nothing in the decision of Hansberry v. Lee which would prevent the preclusive effect of the Dodson consent decree on plaintiffs in the circumstances present here. In that case, the Court held that it would violate due process to have bound the nonparties to a prior decree because of the "potentially conflicting interests" among the representatives and those they sought to bind. Here, of course, there is no actual or potential conflict of interest between the Dodson potential intervenors and these plaintiffs. In fact, the Court in Hansberry recognized that nonparties may be bound:
 
 
 96
 It is familiar doctrine of the federal courts that members of a class not present as parties to the litigation may be bound by the judgment where they are in fact adequately represented by parties who are present, or where they actually participate in the conduct of the litigation in which members of the class are present as parties, . . . or where the interest of the members of the class, some of whom are present as parties, is joint, or where for any other reason the relationship between the parties present and those who are absent is such as legally to entitle the former to stand in judgment for the latter.
 
 
 97
 311 U.S. at 42-43, 61 S.Ct. at 118 (citations omitted) (emphasis added).
 
 
 98
 The majority, in its recognition that an "unjustified failure to intervene can serve to bar a later collateral attack," at 1052, apparently concedes the principle enunciated by the district court in Oburn, a decision which we affirmed, that a party who has had the opportunity to timely contest the validity of the final judgment rendered in the prior suit will be bound by the prior judgment. Oburn v. Shapp, 70 F.R.D. at 549, 552, aff'd mem., 546 F.2d 418 (3d Cir. 1976), cert. denied, 430 U.S. 968, 97 S.Ct. 1650, 52 L.Ed.2d 359 (1977).[1] There is no basis in the record for any finding or inference that plaintiffs did not have an opportunity to file a timely motion to intervene. The majority suggests that plaintiffs may be excused for their failure to make a timely motion to intervene in Dodson on the basis of the allegation in the complaint that the members of the Society Hill Civic Association were not apprised of the Dodson lawsuit until late in 1976. This is a non sequitur, confusing two separate time periods in two different contexts.
 
 
 99
 The proposed Dodson intervenors also had sought to justify their tardiness in failing to file an earlier motion to intervene because they allegedly did not know of the Dodson lawsuit earlier. The district court in Dodson found the proposed intervenors "knew or should have known" of that litigation and therefore their motion, when filed, was untimely. Either these plaintiffs are in the same position as the proposed intervenors, in which case the dismissal of their collateral attack in this suit was justified, or they were not in the same position, in which case they could not have relied on representation by the Dodson intervenors and should have filed their own motion to intervene in the Dodson litigation, setting forth reasons applicable to them to excuse their late motion. The majority gives no reason for excusing plaintiffs from having failed to seek intervention in Dodson, which it agrees is the better course. It merely states that once the other Society Hill residents moved to intervene, "the Association's failure to act may conceivably be excused on the ground that these other residents would adequately protect the Association's interests in the litigation." At 1053, n.6. Even if we agree that the Association was not required to file a contemporaneous motion to intervene in Dodson, once the motion of the proposed intervenors was rejected as untimely, these plaintiffs knew that the intervenors no longer could "adequately protect" their interests. They have offered absolutely on reason in this suit, either before the district court or before us, to excuse their failure to attempt to intervene in the Dodson suit at that time. Their complaint allegation, on which the majority relies, simply does not go to this issue.
 
 
 100
 Had plaintiffs followed the appropriate course and moved to intervene in Dodson, there are a number of different results which might have ensued. If plaintiffs had moved to intervene in Dodson no earlier than did the proposed intervenors and offered no additional explanation for their dilatoriness, their motion to intervene may have been also rejected because it was filed untimely. Then plaintiffs would also be barred from bringing this action, as I assume the majority concedes the Dodson proposed intervenors would be. Apparently the majority does not accept the extreme position espoused by plaintiffs' counsel that even the Dodson proposed intervenors would not be barred from maintaining this suit because the merits of their claim were never reached.
 
 
 101
 Had these plaintiffs moved to intervene in Dodson and their motion to intervene had been rejected because they lacked sufficient legal interest, since they were in the identical position as the proposed Dodson intervenors, then plaintiffs would be barred from bringing this suit because the issue of their right to maintain the action would have been determined adversely against them. In fact, if plaintiffs are in privity with the Dodson intervenors, as I believe they are, then they are already bound by that adverse issue determination. In either event, the prior judgment operates to bar plaintiffs, although it may have been erroneous. Restatement of Judgments § 48, Comment a, at 191 (1942). See also Clark v. Payne, 390 F.2d 647 (3d Cir. 1968); Thomas v. Consolidation Coal Co., 380 F.2d 69, 80 (4th Cir.), cert. denied, 389 U.S. 1004, 88 S.Ct. 562, 19 L.Ed.2d 599 (1967).
 
 
 102
 The one possibility ignored by the majority is that these plaintiffs might have filed a timely motion to intervene in Dodson. Had they chosen that procedure, we simply do not know nor can we predict how the district court would have disposed of that timely motion. It is possible their motion would have been granted. Had the district court denied that motion for any erroneous reason, recourse to correct that judgment was available in this court. Therefore, under these circumstances, there is no basis to permit plaintiffs to maintain this action as a reward for their failure to file a timely motion in the Dodson case.
 
 
 103
 Although the holding of the majority may be highly detrimental to the cause of the low cost integrated housing sought to be achieved by the Dodson plaintiffs and ultimately accepted by HUD and RDA, I am concerned that its effect may be more widespread. It undermines the principle of finality of judgments;[2] it encourages potential intervenors to sit on the sidelines while others go forward to litigate their interests in the hope that an adverse judgment of their right to intervene, or maintain the action, will not adversely affect the on-lookers' ability to maintain a separate and subsequent suit; it encourages plaintiffs or proposed intervenors to sidestep the class procedure so that others similarly situated will retain the opportunity to find a judge or judges more sympathetic to their cause; and it discourages government entities from settling litigation since they will be uncertain of the finality of the ultimate disposition notwithstanding judicial approval of the settlement. The majority gives no reason for opening Pandora's box in this manner.
 
 
 
 [1]
 For ease in reference, and because their positions for purposes of this appeal are virtually identical, we will refer in most instances only to the "Association" throughout this opinion
 
 
 [2]
 All the named tenants who joined as plaintiffs in this second action were also parties to the Octavia Hill consent decree, with the exception of Henry Stroud
 
 
 [3]
 This action was assigned to a district court judge different from the district court judge who presided at the Octavia Hill litigation
 
 
 [4]
 If the property owners had been allowed to intervene in Salvitti, and had received a full and fair adjudication on the merits of the issues raised by the Association here, it is quite possible that the Association would be precluded from the present suit by the res judicata effect of the prior adjudication. This is so because res judicata is frequently extended to those in "privity" with the parties to the suit, or to those whose interests were fully and fairly represented by the parties, see Aluminum Co. of America v. Admiral Merchants Motor Freight, Inc., 486 F.2d 717 (7th Cir.), cert. denied, 414 U.S. 1113, 94 S.Ct. 843, 38 L.Ed.2d 739 (1973); Bruszewski v. United States, 181 F.2d 419 (3d Cir.) (concurring opinion), cert. denied, 340 U.S. 865, 71 S.Ct. 87, 95 L.Ed. 632 (1950). Thus, we do not claim, as the dissent contends, that the Association escapes the res judicata bar simply because it was not a party to the Salvitti suit. Rather, we conclude that the Association is not barred by res judicata because the other property owners were denied intervention and did not have an adjudication on the merits of the issues raised by the plaintiffs in this case. Therefore, the district court in the present case adjudicated the Association's legal rights on the basis of a prior suit in which the Association's interests went entirely unrepresented
 The dissent contends that the issue of the Association's privity with the Dodson intervenors is a foregone conclusion, and refers to a segment of the oral argument as support for that view. See dissenting op., at 1064. The use of the term privity in that context was of course not an admission by the plaintiffs that they were bound by the denial of the motion for intervention brought in Dodson. "Privity" in that interchange was used merely as a shorthand for the possible similarity of position of the former proposed intervenors and the present plaintiffs. No greater meaning can be ascribed.
 In addition, the attorney for the Association took a position in that interchange closely in accord with the view of res judicata we take here. He conceded that if the first group of residents had been allowed to intervene, and had had the same claims adjudicated on the merits, he "would have regarded that as a preclusion of any further litigation of the matter." See dissenting op., at 1064. We have ourselves indicated that such preclusion might well follow as a matter of res judicata from a full litigation of the merits of the Association's claims.
 
 
 [5]
 Paragraph 10 of the consent decree preserves this right to return to court for enforcement, while otherwise dismissing the action with prejudice:
 
 
 [10]
 Upon approval of this Consent Decree by all parties and the Court, this matter shall be marked dismissed with prejudice with respect to the issues raised in the Complaint in this action, however, the rights of the parties to enforcement of the terms of this Consent Decree in this Court shall be preserved
 
 
 [6]
 The dissent contends as a factual matter that the Association knew of the Dodson litigation and could have brought its claim at that time. See dissenting op., at 1065, 1067. Such a conclusion is plainly inappropriate in determining a motion for judgment on the pleadings. As we note in text, the Association alleged in the complaint that it was not apprised of the Dodson suit until late 1976. On a motion for judgment on the pleadings, this allegation must be accepted as true
 Moreover, the Association's assertion of lack of knowledge would operate to defeat any "equitable preclusion" claim, as "knowledge of the first action" is a key factor in the "equitable preclusion" doctrine cited and relied upon by the dissent. Dissenting op., at 1065.
 As noted earlier, certain residents of Society Hill, not parties to the Association's suit, moved to intervene in Dodson v. Salvitti on January 13, 1977. Once this motion to intervene was filed, the Association's failure to act may conceivably be excused on the ground that these other residents would adequately protect the Association's interests in the litigation. See United Airlines, Inc. v. McDonald, 432 U.S. 385, 97 S.Ct. 2464, 53 L.Ed.2d 423 (1977).
 
 
 [7]
 The dissent suggests that the first group of would-be intervenors in Dodson v. Salvitti deliberately chose not to seek intervention as a class to avoid barring other residents from bringing suit to challenge the consent decree. It notes that "the proposed intervenors in Dodson carefully sidestepped (the class action) procedure by moving to intervene only on their own behalf." Dissenting op., at 1065-1066. It also suggests that the group of residents who sought intervention in Dodson is precisely the same group that has brought suit in the instant case, with simply the names changed to circumvent any preclusive effect of the denial of the motion for intervention. It notes that "(u)sing the same counsel and alleging essentially the same claims which the proposed intervenors sought to assert in the Dodson suit, (the residents opposed to low-income housing) filed the suit sub judice, this time denominating as plaintiffs the Society Hill Civic Association and 13 residents of the neighborhood." Dissenting op., 1062. However, these assertions are no more than speculation, as there is no factual or record support for either of these statements, and significantly the dissent refers to none
 Even more so, however, we cannot attach the same relevance as the dissent to the Dodson intervenors' failure to attempt class certification. We have already noted that if these intervenors had been permitted to participate in Dodson and had received a full adjudication of the merits of their claims, the result reached there might well bind the Association and preclude the present suit. See note 4 supra. The matter of class certification thus has little bearing on the ability of the Association to bring the present challenge. We have only held that the Association, and other residents similarly situated, are entitled to at least one adjudication on the merits of their challenge to the consent decree.
 
 
 [8]
 Without making a separate standing analysis for each claim raised by the Association, an analysis required by the "zone of interest" component of current standing doctrine, the district court held that the allegations of injury to property value and "social" values were sufficient to confer standing on the Association for most of its claims. The district court further concluded that, despite meeting this requirement, the Association had stated no claims for which relief could be afforded
 
 
 [9]
 Section 4624 states:
 Replacement housing for tenants and certain others
 In addition to amounts otherwise authorized by this subchapter, the head of the Federal agency shall make a payment to or for any displaced person displaced from any dwelling not eligible to receive a payment under section 4623 . . . . Such payment shall be either-
 (1) the amount necessary to enable such displaced person to lease or rent for a period not to exceed four years, a decent, safe, and sanitary dwelling . . . but not to exceed $4,000 or
 (2) the amount necessary to enable such person to make a down payment . . . on the purchase of a decent, safe, and sanitary dwelling . . . but not to exceed $4,000....
 Relocation payments to persons who owned the homes from which they were displaced, as opposed to those who merely rented their dwellings, are covered in 42 U.S.C. § 4623 (1976).
 
 
 [10]
 The Association also claims on appeal that the tenants do not even fall within the Relocation Act's definition of displaced persons, and therefore are entitled to no benefits under the Act. The Act defines displaced persons as those who leave certain property as a result of the acquisition of the property in connection with a federal project or a project undertaken with federal assistance. The statutory definition reads in full:
 (6) The term "displaced person" means any person who, on or after January 2, 1971, moves from real property, or moves his personal property from real property, as a result of the acquisition of such real property, in whole or in part, or as the result of the written order of the acquiring agency to vacate real property, for a program or project undertaken by a Federal agency, or with Federal financial assistance; and solely for the purposes of sections 4622(a) and (b) and 4625 of this title, as a result of the acquisition of or as the result of the written order of the acquiring agency to vacate other real property, on which such person conducts a business or farm operation, for such program or project.
 42 U.S.C. § 4601(6) (1976).
 The Association claims that the tenants are not covered because the property from which they were evicted was not acquired by any agency, and because no federal funds were involved. See e. g., Alexander v. HUD, 441 U.S. 39, 99 S.Ct. 1572, 60 L.Ed.2d 28 (1979); Messer v. Virgin Islands Urban Renewal Board, 623 F.2d 303 (3d Cir. 1980) (per curiam). Rather, the Association alleges that the tenants were simply evicted by a private landlord from apartments that the landlord sought to renovate. On this appeal, we will not consider this claim of error, however, because it was not asserted in the district court below. Rather, we leave it for consideration by the district court in the first instance if, on remand, this claim is reasserted.
 
 
 [11]
 As noted above, the Association has claimed on appeal that the tenants do not qualify as displaced persons, and are therefore entitled to no benefits at all under the Relocation Act. See note 10 supra
 
 
 [12]
 At oral argument, counsel for the intervening tenants asserted that the parcels in question had been rezoned to permit multifamily housing. Counsel for the Association conceded that the land had been rezoned, but asserted that the change had been made through the unlawful compulsion of HUD. The Association does not appear to have abandoned its claim that the new housing will violate the zoning ordinances in other respects. These are matters that we leave for the district court upon remand
 
 
 [13]
 We have omitted from the list of the Association's additional contentions a number of claims that the Association appears to have abandoned on appeal
 
 
 [14]
 The Association has asserted one claim under state law as to which we make no judgment on whether it was appropriate for judgment on the pleadings in favor of the defendants. The Association claims that the consent decree commits RDA to take actions that exceed its authority under Pennsylvania state law, 35 Pa.Stat.Ann. § 1709(k) (1977). Whether the Association is entitled to complain of these alleged violations, and whether its allegations state claims on which relief can be granted, involve questions of state law that have neither been briefed by the parties nor considered by the district court in the first instance. Under these circumstances, we leave this claim for consideration by the district court upon remand
 
 
 [15]
 The Supreme Court has also authorized the offensive use of the related doctrine of collateral estoppel, i. e., by a plaintiff seeking to impose substantive liabilities, as opposed to a defendant seeking to avoid them, in certain circumstances. See Parklane Hosiery Co. v. Shore, 439 U.S. 322, 99 S.Ct. 645, 58 L.Ed.2d 552 (1979)
 
 
 [16]
 The Association concedes that "fair value" probably means market value, and that no alternate definition suggests itself. Fair value has been defined as market value in other contexts. See Nucor Corp. v. Tennessee Forging Steel Service, Inc., 513 F.2d 151, 153 n.3 (8th Cir. 1975)
 
 
 [1]
 Other courts have held that failure to timely intervene may foreclose a plaintiff from later collaterally attacking a judgment. In Prate v. Freedman, 430 F.Supp. 1373 (W.D.N.Y.), aff'd mem., 573 F.2d 1294 (2d Cir. 1977), cert. denied, 437 U.S. 922, 98 S.Ct. 2274, 56 L.Ed.2d 765 (1978), white police officers filed a separate lawsuit challenging a consent judgment which established an affirmative action plan in police department hiring. The path which the Prate plaintiffs took closely parallels the instant case. Over a year after entry of the consent decree, they attempted to intervene and reopen the suit but were denied intervention because they failed to act in a timely fashion. They then filed a separate complaint, which the court dismissed (on a 12(b) motion) as an impermissible collateral attack on a final court order. Similarly, in Black and White Children of the Pontiac School System v. School District of the City of Pontiac, 464 F.2d 1030-31 (6th Cir. 1972), and McAleer v. American Telephone & Telegraph, 416 F.Supp. 435 (D.D.C.1976), collateral attacks against final judgments affording relief in a school desegregation case and a sex discrimination case were dismissed as improper. The majority seeks to distinguish Oburn and these cases from this one because the original court maintained jurisdiction over the cases. This distinction is unpersuasive because neither the proposed Dodson intervenors nor these plaintiffs will be precluded from asserting their position regarding any action to be taken with respect to the proposed housing which would affect their legitimate interests. For example, if the proposed housing will violate the zoning laws, then plaintiffs will have an opportunity to make that challenge as permitted by local law. Furthermore, if an Environmental Impact Statement is required, as plaintiffs allege, they will have another opportunity to assert that claim when HUD approves the final proposal for development of the properties
 
 
 [2]
 This principle is basic to "all systems of law that have contributed to our jurisprudence." Developments in the Law-Res Judicata, 65 Harv.L.Rev. 818 (1952). Res judicata serves the public interest because it further operates to "save individuals and the Courts from the waste and burden of relitigating old issues," Tillman v. National City Bank of New York, 118 F.2d 631 (2d Cir. 1941)