602 F.2d 1114
 CA 79-2657 PHILADELPHIA WELFARE RIGHTS ORGANIZATION, a
voluntary association by Louise Brookins, trustee Ad litem;
Policy Advisory Committee of the Get Set Day Care Centers of
Philadelphia by Nancy C. Bullett, Chairwoman; Nellie
Rodriguez, individually and on behalf of her minor children,
Alicia, Jose, Ramiro, Judy, Marilyn, Cynthia, Eileen; Rowena
Scott, individually and on behalf of her minor children,
Melvin, David, Blair, Darlene, Lorraine, Yvonne, and
Jermarie, on behalf of themselves and all others similarly
situated, Appellants,
v.
The Honorable Milton J. SHAPP, Governor of the Commonwealth
of Pennsylvania, Helene Wohlgemuth, Secretary of the
Department of Public Welfare of Pennsylvania, and Don Jose
Stovall, Executive Director, Philadelphia County Board of
Assistance, individually and in their official capacity.
 Nos. 78-2221, 78-2353.
 United States Court of Appeals,
Third Circuit.
 Argued April 30, 1979.
Decided July 9, 1979.
 
 Stephen F. Gold (argued), Community Legal Services, Inc., Philadelphia, Pa., for appellants.
 Margaret H. Hunting (argued), Amy Zapp, Deputy Attys. Gen., Edward G. Biester, Jr., Acting Atty. Gen., Pennsylvania Dept. of Justice, Harrisburg, Pa., for appellees.
 Before ADAMS, GIBBONS and WEIS, Circuit Judges.OPINION OF THE COURT
 GIBBONS, Circuit Judge:
 
 
 1
 The plaintiffs, class representatives, appeal (1) from an order granting defendants' motion to modify a consent final injunction, and (2) from an order denying their motion for additional preliminary injunctive relief supplementing that granted in the consent final injunction. The complaint sought enforcement of those sections of Title XIX of the Social Security Act which require states participating in the federal Medicaid program to provide early and periodic screening, diagnosis and treatment (EPSDT) to eligible individuals under the age of 21. 42 U.S.C. § 1396d(a)(4)(B). The plaintiffs are the Philadelphia Welfare Rights Organization, a voluntary association of welfare recipients, Policy Advisory Committee, an association of parents of children receiving day care services, and several individual parents receiving public assistance, whose children are eligible for EPSDT services. The defendants are the Governor and the Secretary of the Department of Welfare of Pennsylvania, and the Executive Director of the Philadelphia County Board of Assistance. These public officials are responsible for Pennsylvania's compliance with federal Medicaid statutes and regulations. The consent decree which was modified was entered on March 15, 1976. We affirm the order modifying it. The motion for a preliminary injunction granting supplementary relief was made on March 28, 1978 and denied on October 3, 1978. We reverse that order and remand for further proceedings.
 
 
 2
 * FACTS AND PROCEEDINGS IN THE DISTRICT COURT
 
 
 3
 a) The EPSDT Program
 
 
 4
 Under Title XIX of the Social Security Act federal funds are made available to the states to cover the major part of the cost of medical assistance for the poor. As a condition of participation, the statute requires each state to make EPSDT services available to children of eligible poor families. Under the EPSDT program, children are screened for medical abnormalities by physical examinations and a battery of specified medical tests. Most problems discovered by screening are then treated under the EPSDT program, either by the examining physician or by other participating doctors. Children are eligible for screening under the EPSDT program from infancy, on a periodic schedule of one screen every three months up to the age of a year and a half, and thereafter once a year until age 21.
 
 
 5
 Regulations of the United States Department of Health, Education and Welfare (HEW) promulgated under 42 U.S.C. § 1396d(a)(4)(B) require that participating states establish an administrative mechanism to identify available screening and diagnostic facilities and to assure that eligible children receive EPSDT services. These regulations have two aspects: outreach, which involves the identification and recruitment of patients, 42 C.F.R. § 444.55 (1978), and administration, which involves the delivery of services. 42 C.F.R. § 441.54 (1978). In Pennsylvania the EPSDT program is administered by the Department of Public Welfare. In most localities the Department operates its outreach program through County Boards of Assistance. The Boards are responsible for notifying eligible persons of the existence and nature of the program, for arranging screening appointments if they are desired, and for assisting with transportation. In the Philadelphia and Pittsburgh metropolitan areas the County Boards are responsible only for informing new welfare recipients of their eligibility for EPSDT services. The task of actively seeking out clients, informing them of the available services, and arranging screening appointments is performed by two contractors, Philadelphia Health Management, and Health Screening Corporation. These contractors run an extensive outreach program. The State Department and the contractors also share responsibility for the recruitment and payment of physicians for the program. For in Pennsylvania, unlike many other states, both screening examinations and treatment are performed predominantly by private physicians.b) Early History of the Litigation
 
 
 6
 The plaintiffs' complaint was filed on February 13, 1973. Its central allegation was that although Pennsylvania was a Medicaid participant it had not complied with the provisions of Title XIX requiring an EPSDT program. The defendants defaulted, and on September 7, 1973 the district court entered a default judgment. That judgment set forth an injunction directing the defendants to refrain from depriving eligible persons of the screening, diagnosis and treatment required by 42 U.S.C. § 1396d and required the defendants within 30 days (a) to promulgate regulations extending EPSDT coverage to all eligible persons, and (b) to implement a statewide outreach program. The defendants were required to establish, within 60 days, a full statewide program for all eligible children. They were also directed to request appropriations from the Pennsylvania legislature adequate to implement the required EPSDT program.
 
 
 7
 In December, 1973, the plaintiffs obtained an order directing the defendants to show cause why supplementary relief should not be granted. Negotiations followed, and in early 1974, the parties entered into an agreement providing for supplementary relief. This agreement was approved and adopted by the court as a consent final judgment on March 15, 1974 (the 1974 decree). The decree established a structure for the implementation of an EPSDT Program. It contained an express waiver of Pennsylvania's Eleventh Amendment or Pennsylvania law immunity. The defendants agreed to keep records of all EPSDT screens for two years. At the end of that period, for each eligible recipient for whom the Commonwealth could not show a health screening profile, a voluntary release, or evidence of an appointment for screening within 30 days, it would pay 133% Of the cost of a "full screening visit" under the program. This penalty payment provision was designed to provide an incentive for implementation of an effective outreach program.
 
 
 8
 In late 1975 the plaintiffs, dissatisfied with the defendants' performance under the 1974 consent decree, moved to hold them in contempt. Before that motion was adjudicated the parties entered into a new agreement. The plaintiffs agreed to a postponement of the payment provisions of the 1974 decree, on condition that the defendants perform 180,000 EPSDT screens during the 1976 calendar year. In the event that the defendants met this goal during 1976 the entire 1974 decree would become void. If not, the payment provisions would remain in effect. The Commonwealth undertook to perform 210,000 screens in 1977, to provide screening appointments within 45 days of a request, and to schedule treatment for medical conditions discovered within 60 days of the screening. The Commonwealth also undertook to make other specific improvements in the Pennsylvania EPSDT program. The district court incorporated the new consent agreement as an order of the court on March 15, 1976 (the 1976 decree). Thus under the 1976 decree the defendants were obliged to achieve 180,000 screens by December 31, 1976 or incur liability for the payments provided for in the 1974 decree.
 
 
 9
 c) The 1976-1978 Motions
 
 
 10
 With the December 31, 1976 deadline approaching, the Commonwealth defendants moved, pursuant to Fed.R.Civ.P. 60(b), to vacate or modify the 1976 consent decree. The motion acknowledged that the goal of 180,000 screens in 1976 would not be met, and suggested that the 210,000 screen goal for 1977 might also be unreachable. The defendants contended that they had attempted good faith compliance, but fell short because of the refusal of EPSDT services by many eligible recipients, the failure of many eligible recipients to show up for scheduled appointments, and a shortfall of participating physicians and dentists. The motion sought, alternatively, complete relief from the decree, or its modification so as to eliminate those provisions with which the defendants were unable to comply. While the defendants' Rule 60(b) motion was pending the plaintiffs filed cross-motions (1) to hold the defendants in contempt for failing to perform 180,000 screens in 1976 and for failing to provide diagnosis and treatment of discovered medical abnormalities within 60 days of screening; and (2) to enforce the payment provisions of the March 15, 1974 decree. A motion filed on March 18, 1977, sought to hold the defendants in contempt for failure to provide any orthodontic services.[1] On March 7, 1978, prior to the hearing on the foregoing motions, the plaintiffs filed a third motion to hold defendants in contempt for failing to meet the goal of 210,000 screens in 1977, for continuing failure to provide treatment within 60 days of screening, and for failing to issue certain monthly reports required by the 1976 decree. This motion also sought to enforce the payment provisions of the 1974 decree for eligible persons not screened in 1977.
 
 
 11
 d) The Hearing and the District Court Rulings
 
 
 12
 A hearing on the several motions was held by the district court on March 28 and 29, 1978. The uncontradicted evidence presented at the hearing showed that screens performed under the Pennsylvania EPSDT program had increased from 115,000 in calendar 1975 to 176,000 in calendar 1976, an increase of over 50%. Simultaneously, the "no show" rate for screening appointments had decreased from 50% To between 35% And 45%. The evidence also showed that Pennsylvania performed the highest number of screens in absolute terms of any state in the nation, and ranked eighth in terms of the percentage of eligible persons screened, ahead of all states of comparable size except for Texas. James McKittrick, the Welfare Department official in charge of the EPSDT program, testified, again without contradiction, that the Pennsylvania EPSDT program was among the 5 or 6 best programs in the country. Chapin Wilson, the HEW official responsible for EPSDT oversight, testified that Pennsylvania's outreach program was superior, and that the state's extensive provider recruitment program was "unique" and impressive.
 
 
 13
 With regard to provision of follow-up services, while the defendants conceded that not all children were treated within 60 days of their screening, a nine state survey of "shows for treatment" (i. e., the percentage of screened persons who later were successfully referred for further treatment) showed that Pennsylvania treated the highest percentage of problems identified through EPSDT screening of any state surveyed, and that this superiority was evident in every treatment category including dental services.
 
 
 14
 These results followed a substantial commitment of resources. The defendants' evidence showed a doubling of expenditures in Allegheny County, and a substantial increase in funding in the Philadelphia area. EPSDT was one of the few programs which was the subject of a special Bulletin from the Secretary of the Department of Welfare, and the only Medicaid sub-program with a full time program administrator for statewide operations.
 
 
 15
 To explain the failure to meet the 180,000 screen standard, the defendants introduced evidence that the total population eligible for EPSDT screening in 1976 was between 230,000 and 250,000 persons, a figure which, due to declining welfare rolls, was significantly lower than had been expected at the time of the consent decree. Given that figure, they argued, and the 35-45% No show rate, achievement of the screening goals was virtually impossible. Substantial testimony was also presented indicating that the Department of Welfare's screening program had been badly set back by unanticipated difficulties in obtaining the cooperation and assistance of the Pennsylvania Department of Health.
 
 
 16
 At the close of the hearing on March 29, 1978 the district court ruled from the bench on all motions except that directed to providing orthodontic services. On each of the other motions he ruled in favor of the defendants, at least in part. The court refused to hold the defendants in contempt, finding that although they had not complied with the 1976 decree, to the extent it lay within their power they had attempted in good faith to do so. The Rule 60(b) motion was granted, and a modified decree entered. The modified decree eliminated the numerical requirements of the two earlier decrees, the related payment provisions, and the absolute 60 day time limit for treatment, but in other respects continued in effect provisions substantially identical with those embodied in the 1976 order. The effect of the modification was a refusal to enforce the payment provisions of the 1974 and 1976 decrees. An order reflecting these rulings was entered on July 18, 1978.
 
 
 17
 On the orthodontia motion the court reserved decision, and requested supplemental briefing. Treating that motion as an application for additional injunctive relief, the court on October 3, 1978 denied it, on the ground that Title XIX and the governing HEW regulations do not require the provision of orthodontic services. These appeals from the July 18, 1978 and October 3, 1978 orders followed. The appeal from the July 18, 1978 orders puts in issue only the grant of Rule 60(b) relief, not the court's denial of the contempt motions. The appeal from the October 3, 1978 order puts in issue the propriety of the court's legal conclusion that orthodontic services are not required by federal law.[2]
 
 II
 THE RULE 60(b) DETERMINATION
 
 18
 The plaintiffs contend that the district court erred in modifying the 1976 decree because the defendants failed to establish grounds for relief from a judgment. As noted above, the 1976 decree was modified in only three respects. First, the strict numerical quotas for annual EPSDT screens, applicable for the years 1976 and 1977, were eliminated. Second, the related provision for payment of 133% Of the cost of such screens to eligible but unscreened persons fell with the elimination of the quotas. Third, the defendants' duty to provide treatment for discovered abnormalities within 60 days of the EPSDT examination in which they were discovered was qualified.[3] A broad and detailed injunction mandating the continued operation of the Pennsylvania EPSDT program in compliance with federal law remains in effect. Moreover paragraph 13 of that injunction requires that the defendants set for each county its share of an annual statewide screening goal.
 
 
 19
 Although the district court did not say so specifically, we conclude that the modification was made pursuant to Rule 60(b)(5), which provides for relief from judgment when "it is no longer equitable that the judgment should have prospective application." We have observed that the standard for reopening a consent final judgment is a strict one. The Rule confers on district judges "(no) standardless residual discretionary power to set aside judgments . . . ." Mayberry v. Maroney, 558 F.2d 1159, 1163 (3d Cir. 1977). Such relief is extraordinary and may be granted only upon a showing of exceptional circumstances. Id. We recognize, as well, that while consent decrees are judicial acts, they have often been recognized as having many of the attributes of a contract voluntarily undertaken. See United States v. ITT Continental Baking Co., 420 U.S. 223, 236, 95 S.Ct. 926, 43 L.Ed.2d 148 (1975); United States v. Armour Co., 402 U.S. 673, 681, 91 S.Ct. 1752, 29 L.Ed.2d 256 (1971). And where, as here, the defendants made a free, calculated and deliberate choice to submit to an agreed upon decree rather than seek a more favorable litigated judgment their burden under Rule 60(b) is perhaps even more formidable than had they litigated and lost. Nevertheless it is undisputed that the court has the power to modify a decree when the danger which the decree sought to prevent has been "attenuated to a shadow" or the decree if unmodified could become for the future "an instrument of wrong." United States v. Swift & Co., 286 U.S. 106, 115, 119, 52 S.Ct. 460, 76 L.Ed. 999 (1932).
 
 
 20
 We note, first, that the decree continues in force most of the provisions designed to enforce the Commonwealth's obligation to comply with 42 U.S.C. § 1396d(a)(4)(B), provisions which have produced one of the most successful EPSDT programs in the country. The modifications in question thus do not leave class members open to the evils to which the lawsuit was first addressed. This fact distinguishes this case from those relied on by the appellants. In United States v. Swift & Co., 286 U.S. 106 (1932), for example, the proposed modification would have restored to the wholesale food marketplace the "ancient peril" of domination by the large meatpackers which the government suit had sought to eliminate. Similarly, in Mayberry v. Maroney, 558 F.2d 1159 (3d Cir. 1977), the application sought to obtain leave to reopen the Behavior Adjustment Unit, closure of which had been the central object of the lawsuit. Nor have the defendant state officials been authorized by the modification of the decree to disregard entirely their obligations to the plaintiff class, as they attempted to do in Vecchione v. Wohlgemuth, 558 F.2d 150 (3d Cir.), Cert. denied, 434 U.S. 943, 98 S.Ct. 439, 54 L.Ed.2d 304 (1977). The question thus is whether the court erred in modifying the decree while preserving its essential features.
 
 
 21
 Second, all of the cited cases concerned relatively simple prohibitory injunctions. Here, however, we deal with the elimination of strict performance requirements of a complex ongoing remedial decree, and with financial incentives designed to encourage the achievement of those requirements. The district court found that despite good faith efforts those mandatory requirements both the screening goals and the treatment within 60 days rule proved impossible of performance. As our review of the evidence makes clear, those findings are fully supported by the record. Any injunction imposing mandatory affirmative duties for the future involves elements of prediction. Whether the prediction as to achievability is made as a result of litigation or, as here, in a negotiated settlement, it will always be speculative to some degree. This is particularly the case when the defendants' ability to achieve compliance depends upon the receptivity of class members or other third parties not formally before the court. See Special Project, The Remedial Process in Institutional Reform Litigation, 78 Col.L.Rev. 784, 818-19 (1978). An approach to the modification of a complex affirmative injunction which over-emphasized the interest of finality at the expense of achievability would inevitably make defendants wary of any decree imposing more than the bare minimum of affirmative obligation. That wariness would, we think, tend to discourage the settlement of injunction actions by consent decree, a high price to pay for the benefits of finality. Even where the decree is litigated, if the power to modify were too closely curtailed the defendants might seek, and the courts might tend to impose, minimum affirmative obligations, perhaps less than realistically achievable, for fear of becoming bound by unreasonable but unchangeable requirements. Where an affirmative obligation is imposed by court order on the assumption that it is realistically achievable, the court finds that the defendants have made a good faith effort to achieve the object by the contemplated means, and the object nevertheless has not been fully achieved, clearly a court of equity has power to modify the injunction in the light of experience. That is what occurred here. Despite a good faith effort at compliance, circumstances largely beyond the defendants' control and not contemplated by the court or the parties in 1976 put achievement of the screening goals and treatment timetable beyond reach. The district court did not err in modifying both.
 
 
 22
 The payment provision was included not to provide a windfall to unidentified class members, but to provide a financial incentive for the achievement of outreach goals which, although diligently pursued, proved in practice to be unattainable. Many of those who were not screened in 1976 and thus might have received the incentive payments may have been screened and even treated since. Payment to them now, when the screening goals are no longer included in the decree, would be no incentive for anything, but merely a punitive exercise. Were the payment provision to be enforced the decree would become "an instrument of wrong." United States v. Swift & Co., 286 U.S. at 115, 52 S.Ct. 460. Thus the court did not err in eliminating the payment provision as well.
 
 
 23
 Thus we conclude that the order of July 18, 1976 modifying the 1976 decree should be affirmed.
 
 III
 THE ORTHODONTIA ISSUE
 
 24
 The district court held that defendants' conceded failure to provide medically necessary, as distinguished from cosmetic, orthodontic dental care to eligible children as a part of its EPSDT program was not inconsistent with Title XIX of the Social Security Act or with the implementing HEW regulations. The possible consequences of the Commonwealth's omission of medically necessary orthodontic care are demonstrated on the present record by the case of Laureen Jerico, the eleven year old daughter of Arlene Millard, a plaintiff class representative. A report from Dr. James A. Bond, D.D.S., Chairman, Department of Orthodontics, Temple University School of Dentistry, indicated that Laurene had a medical need for orthodontic treatment. According to Doctor Bond:
 
 
 25
 The abnormal eruption of the maxillary right cuspid has contributed to a history of trauma to the cheek mucosa in that location. Moreover, since the root of this tooth has been forced outward (toward the cheek), by the crowding condition, the over-lying tissues have been stretched beyond normal limits which could lead to eventual recession of these tissues. Treatment will require orthodontic appliances of both arches and extraction of teeth to provide arch length for tooth alignment.
 
 
 26
 At the Pennsylvania Department of Public Welfare's hearing on the issue of Laurene's need for orthodontic services, an impartial hearing examiner denied Laurene medical assistance for orthodontia because it was not a part of the defendants' medical assistance program. The hearing examiner found that the "treatment prescribed was not cosmetic but was required because the child's dental condition constituted a hazard to future dental health." Mrs. Millard testified that Laurene could not bite anything hard, that her gums bled when she ate and when she brushed her teeth, and that she was in pain. The issue posed by the district court holding is whether orthodontic treatment for conditions such as Laurene Jerico's is required for Medicaid eligible children by Title XIX and the HEW regulations.
 
 
 27
 Any state which participates in the Medicaid program must provide to the categorically needy a number of specified health services. 42 U.S.C. § 1396d(a). Among the mandatory programs is EPSDT. A state must provide:
 
 
 28
 . . . such early and periodic screening and diagnosis of individuals who are eligible under the plan and are under the age of 21 to ascertain their physical or mental defects, and such health care, treatment, or other measures to correct or ameliorate defects and chronic conditions discovered thereby, as may be provided in regulations of the Secretary. . . .
 
 
 29
 42 U.S.C. § 1396d(a)(4)(B).
 
 
 30
 The Secretary's implementing regulations define EPSDT care treatment and other required corrective or ameliorative measures as follows:
 
 
 31
 (a) the medicaid agency must make available, to recipients under age 21, early and periodic screening and diagnosis to determine physical and mental defects and treatment of conditions discovered within the limits in the plan on amount, duration, and scope.
 
 
 32
 (b) Subject to utilization controls it may impose, the agency must also make available, if they are not otherwise included in the plan
 
 
 33
 (1) Treatment of visual and hearing defects, including provision of eyeglasses and hearing aids; and
 
 
 34
 (2) Dental services needed for relief of pain and infection, restoration of teeth, and maintenance of dental health.
 
 
 35
 42 C.F.R. § 441.52 (1976) (emphasis added). It seems plain to us that the italicized language includes orthodontic dental care of the kind required by patients such as Laurene Jerico.
 
 
 36
 Our reading of the regulation is consistent with HEW's Medical Assistance Manual, MSA-PRG-21 (6/28/72); 2 Medicare and Medicaid (CCH) P 14551.17 (Nov. 9, 1971), which states that:
 
 
 37
 "(a)s a minimum, the dental services that must be provided include . . . services for dental disease which, if left untreated, may become acute dental problems or may cause irreversible damage to the teeth or supporting structures."
 
 
 38
 Where orthodontic services are required to prevent "acute dental problems" or "irreversible damage" we think that they fall within the scope of the directive.
 
 
 39
 The Manual includes a non-inclusive list of dental services quoted in the margin.[4] Neither in any regulation nor in the Manual is there any suggestion that orthodontia is excluded. It is true that orthodontia is not specifically mentioned in the five therapeutic services listed in the Manual. But neither is extraction of teeth, a procedure which the Commonwealth concedes is frequently essential to treatment.
 
 
 40
 In the only case which has been called to our attention dealing with the availability of orthodontia to EPSDT recipients, the Supreme Judicial Court of Maine rejected the same contention which the Commonwealth makes here. Brooks v. Smith, 356 A.2d 723 (Me.1976). Justice Weatherbee held, and we agree, that the federal regulation and treatment manual cannot fairly be read as requiring the complete removal of a child's teeth and the substitution of a removable prosthesis if the child has a dental condition correctable by less drastic orthodontic procedures.
 
 
 41
 Against the foregoing reading of the statute, regulations and manual the defendants offer the testimony of Mr. Chapin Wilson, a HEW employee charged with the responsibility of implementing the EPSDT program nationwide. He testified that federal regulations do not require the provision of orthodontic services. He did not, however, advance any persuasive reason for this legal opinion, and the authoritative voice of the agency is the text of the regulation. We read it, as does the Supreme Court of Maine, as mandating the provision of all dental services, including orthodontia, "needed for relief of pain and infection, restoration of teeth, and maintenance of dental health."
 
 
 42
 Thus the order of October 3, 1978 denying injunctive relief against the denial of orthodontic services under the Pennsylvania EPSDT program must be reversed.
 
 VI
 CONCLUSION
 
 43
 The Order of July 18, 1978 appealed from in No. 78-2221 will be affirmed. The Order of October 3, 1978 appealed from in No. 78-2353 will be reversed and the case remanded for the entry of an appropriate supplementary injunction requiring the Commonwealth to provide to eligible EPSDT recipients those orthodontic services which we have held to be required by HEW's implementing regulations.
 
 
 
 [1]
 This motion was later orally modified to a motion for a preliminary injunction
 
 
 [2]
 The complaint asserts jurisdiction under 28 U.S.C. § 1331 and alleges that the amount in controversy exceeds $10,000. That allegation was never put in issue, and the consent judgment of March 15, 1974 must be deemed to have adjudicated the court's subject matter jurisdiction since the time for direct appeal from that judgment has already run. See, e. g., Dowell v. Applegate, 152 U.S. 327, 14 S.Ct. 611, 38 L.Ed. 463 (1894); Des Moines Navig. & R. Co. v. Iowa Homestead Co., 123 U.S. 552, 8 S.Ct. 217, 31 L.Ed. 202 (1887); McCormick v. Sullivan, 23 U.S. (10 Wheat.) 192, 6 L.Ed. 300 (U.S.1825). Cf. Durfee v. Duke, 375 U.S. 106, 84 S.Ct. 242, 11 L.Ed.2d 186 (1963). The defendants have not contested subject matter jurisdiction under § 1331 in their Rule 60(b) motion or on appeal. We have no occasion, therefore, to consider the alternative allegation of jurisdiction under 28 U.S.C. § 1343(3). Cf. Chapman v. Houston Welfare Rights Org., --- U.S. ----, 99 S.Ct. 1905, 60 L.Ed.2d 508 (1979)
 
 
 [3]
 Under the 1976 decree the defendants' duty to provide treatment within 60 days was absolute. The new decree permits relief from the 60 days obligation where "good reason for a greater length of time is documented in the recipient's case record."
 
 
 [4]
 a. Emergency Services: Emergency dental care services are those necessary to control bleeding, relieve pain, eliminate acute infection; operative procedures which are required to prevent pulpal death and the imminent loss of teeth; treatment of injuries to the teeth of supporting structure (e. g. bone or soft tissues contiguous to the teeth); and palliative therapy for periocoronitis associated with impacted teeth. Routine restorative procedures and root canal therapy are not considered emergency procedures
 b. Preventive Services: Preventive dental services include:
 
 
 [1]
 Instruction in self-care oral hygiene procedures (provided individually or in groups)
 
 
 [2]
 Oral prophylaxis (cleaning of teeth) necessary as a precursor to the application of dental caries preventives in areas where such applications are indicated (provided in groups or individually), or oral prophylaxis independent of the application of caries preventives for patients 10 years of age or older
 c. Therapeutic Services: Therapeutic Services include:
 
 
 [1]
 Pulp therapy for permanent and primary teeth
 
 
 [2]
 Restoration of carious (decayed) permanent and primary teeth with silver amalgam, silicate cement, plastic materials and stainless steel crowns
 
 
 [3]
 Scaling and curettage
 
 
 [4]
 Maintenance of space for posterior primary teeth lost prematurely
 
 
 [5]
 Provision of removable prosthesis when masticatory function is impaired, or when existing prosthesis is unserviceable, or in instances when esthetic considerations interfere with employment or social development