NATIONAL WILDLIFE FEDERATION and New Jersey State Federation of Sportsmen's Clubs, Appellants,

v.

Anne M. GORSUCH, in her official capacity as Administrator of the United States Environmental Protection Agency and Jacqueline Schaeffer, in her official capacity as Regional Administrator of Region II of the United States Environmental Protection Agency, 26 Federal Plaza, New York, New York 10007 and Robert E. Hughey, in his official capacity as Commissioner of the New Jersey Department of Environmental Protection, Trenton, New Jersey 08625 and Richard Killeen, in his official capacity as Chairman of the Commissioners of the Bergen County Utilities Authority, P.O. Box 122, Little Ferry, New Jersey 07643 and The Bergen County Utilities Authority, P.O. Box 122, Little Ferry, New Jersey 07643 and Thomas Cifelli, in his official capacity as Chairman of the Passaic Valley Sewerage Commissioners, 600 Wilson Avenue, Newark, New Jersey 07105 and The Passaic Valley Sewerage Commissioners, 600 Wilson Avenue, Newark, New Jersey 07105 and George Gordon, in his official capacity as Chairman of the Commissioners of the Linden Roselle Sewerage Authority, P.O. Box 124, Linden, New Jersey and The Linden Roselle Sewerage Authority, P.O. Box 124, Linden, New Jersey 07036 and Robert H. Grasmere, in his official capacity as Chairman of the Board of the Joint Meeting of Essex and Union Counties, 500 South First Street, Elizabeth, New Jersey 07202, and The Joint Meeting of Essex and Union Counties, 500 South First Street, Elizabeth, New Jersey 07202 and Frederick Kurtz, in his official capacity as Chairman of the Commissioners of the Middlesex County Utilities Authority, P.O. Box 461, Sayreville, New Jersey 08872 and Middlesex County Utilities Authority, P.O. Box 461, Sayreville, New Jersey 08872 and Rosalie Berger, in her official capacity as Chairman of the Commissioners of the Rahway Valley Sewerage Authority, P.O. Box 227–E, Rahway, New Jersey 07065 and The Rahway Valley Sewerage Authority, P.O. Box 227–E, Rahway, New Jersey 07065, Appellees.

No. 83–5753.

United States Court of Appeals, Third Circuit.

Argued June 11, 1984.
Decided Sept. 20, 1984.

Thomas K. Bick (argued), Kenneth S. Kamlet, Nat. Wildlife Federation, Washington, D.C., Joseph A. Ascione, Fischer, Kagan & Chester, Clifton, N.J., for appellants, Nat. Wildlife Federation and New Jersey State Federation of Sportsmen's Clubs.

Roger J. Marzulla (argued), Julie Weisman, U.S. Dept. of Justice, Land & Nature Resources Div., Washington, D.C., Joseph Freedman, U.S. Environmental Protection Agency, Washington, D.C., for Federal appellees.

Milton B. Conford (argued), Wilentz, Goldman & Spitzer, Woodbridge, N.J., for Middlesex County Utilities Authority and Frederick Kurtz.

Menelaos W. Toskos, Moses & Toskos, Hackensack, N.J., for Bergen County Utilities Authority and Richard Killeen.

David P. Schneider, Deputy Atty. Gen., Environmental Protection Section, Trenton, N.J., for Robert E. Hughey, Com'r of the N.J. Dept. of Environmental Protection.

Charles C. Carella, Carella, Byrne, Bain & Gilfillan, P.A., Newark, N.J., for Passaic Valley Sewerage Com'rs and Thomas Cifelli.

George J. Minish, Minish & Williams, West Orange, N.J., for Joint Meeting of Essex & Union Counties and Robert Grasmere.

Robert L. Sheldon, Roselle Park, N.J., for the Rahway Valley Sewerage Authority and Frederick Soos.

Raymond G. Tomaszewski, Linden, N.J., for Linden Roselle Sewage Authority and George Gordon.

Before WEIS and BECKER, Circuit Judges, and OLIVER, District Judge.*

## OPINION OF THE COURT

WEIS, Circuit Judge.

In their complaint, plaintiffs attacked the terms of consent decrees to which they

* The Honorable John W. Oliver, United States District Judge for the Western District of Missouri, sitting by designation.

were not parties. The district court dismissed the complaint because plaintiffs had not timely intervened in the earlier lawsuit. We will affirm.

Plaintiffs brought suit against officers of the EPA, the commissioner of the state environmental agency, and six New Jersey sewage authorities and their officials. The complaint asked for injunctive relief requiring defendants to phase out the authorities' practice of dumping sewage sludge into the ocean, and also sought modification of certain consent judgments previously entered by the district court. The court dismissed the case, concluding that the two counts that have been appealed were improper collateral attacks on existing judgments.[1]

The plaintiffs' complaint recites their objections to the dumping of contaminated sewage sludge in an area of the Atlantic Ocean known as the New York Bight, located 12 miles off the New York New Jersey coastline. Municipal sewage authorities in those two states have carried on disposal operations in the area since 1924. Plaintiffs contend this practice presents serious risks to human health and the coastal environment and is unnecessary because non-ocean alternatives are available.

Count I alleges that the dumping is prohibited by the London Convention, an international treaty to which the United States is a signatory. 26 U.S.T. 2403, T.I.A.S. No. 8165. Count II asserts violations of the Marine Protection, Research, and Sanctuaries Act of 1972, 33 U.S.C. §§ 1401–1445 (1982).

The case at hand is closely related to two other suits that addressed sludge disposal in the Bight. The first was filed in the Southern District of New York by the City of New York which challenged the EPA's refusal to renew the city's dumping permit beyond December 31, 1981. *City of New York v. EPA*, 543 F.Supp. 1084 (S.D.N.Y. 1981). While that suit was pending, five New Jersey authorities brought similar suits against the EPA in the District Court of New Jersey.[2] The record does not indicate that the New Jersey cases were formally consolidated. They were all assigned to Judge Sarokin of the District of New Jersey and all were terminated by identical consent judgments.

The New York action was terminated first. The district court concluded that the EPA had misconstrued the Marine Protection Act, and directed the agency to revise its regulations as well as reconsider New York's permit application. *City of New York v. EPA*, 543 F.Supp. 1084 (S.D.N.Y. 1981). In the interim, the city was permitted to continue ocean dumping. The New York court filed an initial opinion in April 1981. After allowing the parties to submit suggested amendments, it issued a revised opinion in August 1981. The judgment was entered in November 1981, and the government did not appeal.

Although aware of the New York case, plaintiff National Wildlife Association did not intervene or participate, confining its activity to "behind the scenes" coordination with the EPA. National Wildlife, together with plaintiff New Jersey State Federation of Sportsmen's Clubs, filed an amicus curiae brief in the New Jersey action in September 1981 and a motion to intervene in April 1982.

In the spring of 1982, the parties to the New Jersey action were engaged in negotiations and eventually agreed to consent judgment that tracked the provisions of the order entered in the New York case. The agreement stated that "pursuant to the judgment in the case of *City of New York v. EPA* . . . , EPA intends to revise its ocean dumping regulations." The sewage authorities were to resubmit applications for

---

**1.** Plaintiffs do not appeal the district court's dismissal of Counts III and IV of the complaint for lack of subject-matter jurisdiction. Those counts alleged violations of the Federal Water Pollution Control Act, 33 U.S.C. § 1251 *et seq.* (1982).

**2.** In another action, the United States sued the Bergen County Utility Authority, which filed a third-party complaint against the EPA. For the purposes of this appeal, we refer to the six actions collectively as the "New Jersey action" or the "New Jersey suit."

permits and would be allowed to continue dumping in the interim. As had the order in the New York case, the decrees returned the matter to the administrative process for reconsideration under revised regulations.

Motions for the entry of New Jersey consent judgments were presented to Judge Sarokin, and he signed them on May 13, 1982. On the same day, Judge Sarokin denied the plaintiffs' motion to intervene as untimely. Plaintiffs did not appeal the denial of their motion for intervention.

Seven months later, on December 22, 1982, plaintiffs filed the present suit in the District of New Jersey, seeking modification of the consent decrees. The case was assigned to Chief Judge Fisher.

In ruling on defendants' motions to dismiss, Chief Judge Fisher pointed out that plaintiffs had failed to appeal the denial of intervention. He also observed that they would have an opportunity to participate in the administrative rule-making process then underway in compliance with the New York decision and New Jersey decrees. Furthermore, he commented that if regulations adverse to their position were adopted, plaintiffs could file an independent suit. Counts I and II were therefore dismissed as impermissible collateral attacks.

On appeal, plaintiffs contend that because they were denied the right to intervene, they are not precluded from attacking the non-adjudicated, non-adversarial New Jersey consent decrees. They argue that they were under no obligation to intervene, and even if they were, they took action within a reasonable time after learning that the EPA would not appeal the New York judgment. Finally, plaintiffs assert that they relied on comments made from the bench by Judge Sarokin when he denied their intervention motion. At that time, he suggested that plaintiffs were not barred from bringing an independent action on the applicability of the London Convention.

Defendants assert that dismissal was proper on a collateral attack rationale. As additional reasons for affirmance, they urge that the New York district court properly construed the Marine Protection Act and that plaintiffs do not have a private right of action under the London Convention.

Both the legislative history of the Marine Protection Act and the EPA's checkered history of enforcement of the statute are detailed in the opinion of the Southern District of New York. *City of New York*, 543 F.Supp. 1084. A discussion of the London Convention and its relationship to the Act may be found in *National Wildlife Federation v. Costle*, 629 F.2d 118 (D.C.Cir.1980). In view of the extensive background material contained in these two opinions, it is not necessary to recite more than a summary statement of the legal issues.

The Marine Protection Act grants the EPA the authority to issue permits for ocean dumping when it "determines that such dumping will not unreasonably degrade ... the marine environment." 33 U.S.C. § 1412(a). In 1977, the EPA adopted revised regulations listing certain materials that, if present in the sludge, would give rise to a presumption of unreasonable degradation of the marine environment. In those circumstances, permits would be issued only on an interim basis and correction or complete phase out of dumping operations was required by December 31, 1981. 40 C.F.R. § 220.3(d) (1983). New York City and the New Jersey authorities were issued interim permits subject to the 1981 deadline.

When the City of New York challenged the EPA's refusal to renew its permit, the Southern District of New York concluded that the presumption established by the EPA regulations was not in conformity with the statute. 543 F.Supp. at 1099–1103. Rather than apply a presumption, the agency was required to balance a number of factors and determine for each application whether the dumping would unreasonably degrade the environment. Furthermore, instead of the EPA's absolute ban on all dumping, the court read the statutory requirement to eliminate dump-

ing after December 31, 1981 as restricted only to sludge that "unreasonably degrades." *See* 33 U.S.C. § 1412a.

The opinion of the New York court did not discuss the London Convention. It is helpful to review briefly its relevance to the dispute at hand.

Soon after Congress enacted the Marine Protection Act in 1972, the United States and 30 other nations became signatories to the Convention on the Dumping of Waste at Sea, referred to as the London Convention, 26 U.S.T. 2403, T.I.A.S. No. 8165. The treaty prohibited ocean dumping of specific substances and allowed the practice as to other listed materials only on a permit basis. Permits were to be issued after consideration of various factors, such as prior studies of the dump site's characteristics, the effect on amenities and marine life, other uses of the sea, and alternative methods of disposal, including land-based processes.

In 1974, Congress amended the Marine Protection Act "to incorporate in domestic law those features of the Convention" not then included in the statute. H.R.Rep. No. 568, 93d Cong., 1st Sess. 6 (1973). For example, a provision specifying permit criteria was amended to add that "without relaxing the requirements of this title, the Administrator, in establishing or revising such criteria, shall apply the standards and criteria binding upon the United States under the Convention." *See* 33 U.S.C. § 1412(a).

In 1975, the National Wildlife Federation challenged regulations promulgated by the EPA to conform to the statutory amendments. The Court of Appeals for the District of Columbia Circuit rejected most of the organization's contentions and held that the EPA was not required to specifically include the Convention's evaluation factors in the criteria for the grant of any particular permit. The court reasoned that the agency complied with the statute by considering those factors and taking them into account in establishing the criteria generally, rather than applying them to each individual permit request. *Costle*, 629 F.2d at 135.

Plaintiffs contend in the case at hand that some of the material being discharged into the New York Bight contains substances prohibited by the London Convention as well as by the Marine Protection Act. Plaintiffs also assert that the New York District Court's interpretation of the Act is incorrect and stress that the court did not take the Convention into account in its decision to allow continued dumping by New York City.

When the parties to the New Jersey suit presented their motions to enter consent decrees, plaintiffs argued against the proposals, citing alleged violations of the Convention. After argument on those motions and the plaintiffs' request for intervention, Judge Sarokin rejected the motion to intervene, commenting that he was satisfied plaintiffs would have a "full and fair opportunity to be heard if appropriate during the course of the administrative process, the contemplated rulemaking and the permit hearings" required by the New York judgment. He went on to say, "[I]f the proposed intervenors are correct in respect to their position regarding the London Dumping Convention they certainly are not barred from alleging [in] an independent action, the applicability of the London Convention, if indeed any action has been taken or will be taken by the Governmental agency pursuant to these consent judgments."

In signing the consent decrees, Judge Sarokin emphasized "that the execution by the Court of the judgments merely represents the embodiment of the agreement reached by the parties but does not constitute a review and approval of the terms and conditions" since there had been no evidentiary hearing. During argument before Judge Sarokin, counsel for the EPA stated that the agency intended to address the Convention and all other dumping-related matters in the forthcoming regulatory proceedings. Counsel also argued that plaintiffs had not attempted to bring their views on the Convention to the attention of the New York court.

It is against this factual background that we consider Chief Judge Fisher's holding that the case at hand is an impermissible collateral attack on the New Jersey consent judgments.

 The entry of a consent decree is "a judicial function and an exercise of the judicial power." *Pope v. United States,* 323 U.S. 1, 12, 65 S.Ct. 16, 22, 89 L.Ed. 3 (1944). Such decrees may be reviewed on appeal when there is a claim that actual consent or jurisdiction was lacking, but " 'a decree, which appears by the record to have been rendered by consent, is always affirmed, without considering the merits of the cause.' " *Swift & Co. v. United States,* 276 U.S. 311, 324, 48 S.Ct. 311, 314, 72 L.Ed. 587 (1928) (quoting *Nashville, Chattanooga & St. Louis Ry. Co. v. United States,* 113 U.S. 261, 266, 5 S.Ct. 460, 462, 28 L.Ed. 971 (1885)).

 Although consent judgments may be modified in light of changed circumstances, the standard for reopening such a judgment is a strict one. *Delaware Valley Citizens Council v. Pennsylvania,* 674 F.2d 976, 982 (3d Cir.), *cert. denied,* 459 U.S. 905, 103 S.Ct. 206, 74 L.Ed.2d 165 (1982); *Philadelphia Welfare Rights Organization v. Shapp,* 602 F.2d 1114, 1119–20 (3d Cir.1979), *cert. denied,* 444 U.S. 1026, 100 S.Ct. 689, 62 L.Ed.2d 660 (1980). When a decree is challenged by one of the consenting parties, the burden of showing changed circumstances is a heavy one because "a healthy respect for the finalty of judgments demands no less." *Mayberry v. Maroney II,* 558 F.2d 1159, 1163 (3d Cir. 1977). "A consent decree is, after all, a judgment and is entitled to a presumption of finality." *Delaware Valley,* 674 F.2d at 981.

 When a consent decree's essential features are attacked on the basis of facts which existed before entry or contentions based on legal doctrine then applicable, the challenge stands on the same basis as one employing similar grounds in an adjudicated case. In both instances, considerations of finality are dominant. Even though a controversy was not adjudicated, the case may not be reopened freely. This restrictive approach is justifiable because the parties chose to compromise their differences and submit to an agreed final decree rather than risk the possibility of a more or less favorable litigated judgment. *See Philadelphia Welfare Rights Organization,* 602 F.2d at 1120.

When the attack is by a third party who did not participate in the formation of the consent judgment, that argument is not as persuasive. The decision to compromise on certain issues, although an acceptable option to the litigating party, may not be to an outside party. But that consideration is not confined strictly to suits terminated by consent decrees. In an adjudicated case, it would not be unexpected that a litigating party may either deliberately or inadvertently fail to present a certain question for decision even though the issue is of particular concern to a nonparty.

In this case, the matter of the London Convention presents an example of an omitted issue. In the adjudicated New York case, it appears that the EPA did not rely on the Convention per se. That may have been a tactic based on a belief that in pertinent part the Marine Protection Act and the Convention overlapped. It may also have been that in the circumstances the Convention was considered less important than the statute or raised troublesome procedural questions. When the time came for considering a consent decree in the New Jersey cases, the same factors may have led the parties to bypass the issue.

The extent to which the judgment should or should not be binding on plaintiffs here should be the same in both the New York and New Jersey cases. In both situations, the plaintiffs' contention remains the same—that they were not parties, and therefore should not be bound by the judgments.

Precluding an independent action by a nonparty to an earlier lawsuit because of a failure to intervene in that suit has been characterized as a "new and tentative" concept. 18 C. WRIGHT, A. MILLER, E.

COOPER, FEDERAL PRACTICE AND PROCEDURE § 4452 at 439 (1981). The suggestion, however, was voiced some years ago by the Supreme Court in *Provident Tradesmen's Bank & Trust Co. v. Patterson*, 390 U.S. 102, 88 S.Ct. 733, 19 L.Ed.2d 936 (1968). In discussing the status of a purportedly indispensable party, the Court said, "It might be argued that [he] should be bound by the previous decision because, although technically a nonparty, he had purposely by-passed an adequate opportunity to intervene." *Id.* at 114, 88 S.Ct. at 740. The decision did not turn on that point, but the Court's observation is interesting. The opportunity to intervene in the context of preclusion was also the subject of comment in *Penn Central Merger and N. & W. Inclusion Cases*, 389 U.S. 486, 505–506, 88 S.Ct. 602, 611–612, 19 L.Ed.2d 723 (1967). *See also Western Shoshone Legal Defense & Educational Association v. United States*, 531 F.2d 495, 502 (Ct.Cl.), *cert. denied*, 429 U.S. 885, 97 S.Ct. 236, 50 L.Ed.2d 166 (1976). *Cf. Brotherhood of Railroad Trainmen v. Baltimore & Ohio Railroad Co.*, 331 U.S. 519, 67 S.Ct. 1387, 91 L.Ed. 1646 (1947).

 Strong countervailing considerations counsel careful weighing of the circumstances before applying this emerging doctrine. The important principles on the other side of the scale are that, generally, a judgment does not bind nonparties, *see Hansberry v. Lee*, 311 U.S. 32, 40–41, 61 S.Ct. 115, 117–118, 85 L.Ed. 22 (1940), due process accords a person a day in court, *see Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 327 n. 7, 99 S.Ct. 645, 649 n. 7, 58 L.Ed.2d 552 (1979), and a stranger to a lawsuit is not under a duty to intervene, *see Chase National Bank v. City of Norwalk*, 291 U.S. 431, 441, 54 S.Ct. 475, 479, 78 L.Ed. 894 (1934). *See also* 18 FEDERAL PRACTICE AND PROCEDURE § 4452 at 446.

We encountered some of the problems associated with the timeliness of an attack on a consent judgment in *Society Hill Civic Association v. Harris*, 632 F.2d 1045 (3d Cir.1980). In that case, the plaintiff was an association of property owners that had not been a party to a consent decree entered in an earlier suit. The court held that the plaintiff was not necessarily barred from bringing a separate suit because the plaintiff alleged that it did not know of the earlier action until late in its progress. We remanded for the district court to determine "if, under all the circumstances, the [plaintiff] delayed unreasonably in acting to protect its interests." *Id.* at 1053.

In the *Society Hill* scenario, however, an intervention motion filed in the consent suit by another group of property owners had been rejected as untimely. Although these people had not joined in the separate suit and were not before the court, our opinion contrasted their status and said: "[A]n unjustified or unreasonable failure to intervene can serve to bar a later collateral attack. . . . [T]hese property owners should not be allowed to escape the consequences of their own tardiness by recasting their motion for intervention as a complaint in a suit collaterally attacking the prior judgment." *Id.* at 1052.

That disapproval is applicable to plaintiffs here. They did have an opportunity to intervene pursuant to Fed.R.Civ.P. 24 and participate in the New Jersey proceedings before the consent judgments were filed. Plaintiffs do not disguise the fact that the present suit is an effort to bring before the court the same matters encompassed in their proposed intervention which the court denied.

 The critical fact is that plaintiffs deliberately chose not to appeal that decision as they had a right to do. *See Commonwealth of Pa. v. Rizzo*, 530 F.2d 501 (3d Cir.), *cert. denied*, 426 U.S. 921, 96 S.Ct. 2628, 49 L.Ed.2d 375 (1976). *See also Delaware Valley Citizens' Council v. Commonwealth of Pennsylvania*, 674 F.2d 970 (3d Cir.1982). Therefore we must accept as final the ruling that the attempted intervention was too late. A person should not be permitted to intervene if a party to the suit is adequately representing the interest of the prospective intervenor.

See Fed.R.Civ.P. 24. As a correlative, in considering timeliness the beginning point should be the stage when inadequate representation becomes apparent. *See Legal Aid Society of Alameda v. Dunlop,* 618 F.2d 48 (9th Cir.1980). In this case, that point was reached when the EPA did not appeal the New York decision. There is some ambiguity in Judge Sarokin's ruling as to whether he utilized that starting point or the date on which Wildlife filed its amicus brief in the New Jersey action. From that perspective, it is at least arguable that the decision on timeliness was potentially assailable. Wildlife's failure to appeal, however, makes this case like *Society Hill,* where the plaintiffs suffered the consequences of their failure to take action. Under *Society Hill,* the plaintiffs' attempts to collaterally attack the consent decrees are barred.

We are not persuaded that Judge Sarokin's remarks from the bench serve to excuse plaintiffs. The judge's statement was that plaintiffs would not be barred from alleging an independent action "if indeed any action has been taken or will be taken by the Governmental agency pursuant to these consent judgments." The judge limited his comment to a suit raising the London Convention but, beyond this, did not elaborate on his reference to an independent action.

Judge Sarokin's remarks, however, did follow a somewhat extended discussion about the rule-making procedures directed by the New York order and the fact that references to the London Convention would be made in those proceedings. The judge also stated he was satisfied that plaintiffs would have an adequate opportunity to be heard there. Plaintiffs were not justified in construing the comments as a license to disregard the administrative proceedings and file a separate suit raising only the London Convention as a bar to the consent decrees. Nor do the comments warrant an escape from the consequences of the decision not to appeal the determination that intervention was too late.

Plaintiffs are experienced and sophisticated litigants and well aware that chance remarks from the bench cannot justify a party foregoing its own research on legal issues, particularly in an area as unsettled as the one at hand. The judge's remarks did not relieve plaintiffs from making their own informed decision.

National Wildlife was no stranger to either the New York or the New Jersey cases. It was aware of the suits from the outset, and made a strategic decision not to intervene in the New York action because it believed its interests were adequately represented by the EPA. In April 1981, National Wildlife contacted the Department of Justice and secured copies of the pleadings that had been filed in the New Jersey proceedings. At that time, it also obtained a copy of the initial opinion in the New York case, in which the court requested the submission of suggested amendments. *See* 543 F.Supp. at 1085 n. \*. National Wildlife's contention that the London Convention was critical could have been brought to the attention of the court at that time.

In any event, it is obvious that National Wildlife was tracking the progress of the cases in both forums. It also did not hesitate to engage in certain sideline activity. In addition to its early liaison with the EPA and the submission of an amicus brief in New Jersey, plaintiff joined a group of Congressmen who unsuccessfully urged that the government appeal the New York decision. Despite their lack of success and National Wildlife's dissatisfaction with the result, the appeal period for the *City of New York* decision ended without the organization taking any measures for more formal participation. It took no steps to intervene for the purpose of taking an appeal. *See EEOC v. American Telephone & Telegraph Co.,* 506 F.2d 735 (3d Cir. 1974); *United States v. American Telephone & Telegraph Co.,* 642 F.2d 1285 (D.C.Cir.1980); *Smuck v. Hobson,* 408 F.2d 175 (D.C.Cir.1969). *Cf. Delaware Valley Citizens Council v. Commonwealth of Pennsylvania,* 674 F.2d at 974 (3d Cir. 1982).

Plaintiffs, moreover, could not have been blind to the relationship between the New York and the New Jersey litigation. The two cases not only presented identical issues, but addressed the discharge of sewage in precisely the same area of the ocean. That EPA had not been and would not likely be successful in convincing the New York court of the plaintiffs' position should have been obvious by April 1981, the date of the initial opinion in *City of New York.* At that point, plaintiffs could not ignore the likelihood that the New York decision would have a domino effect. Yet, it was not until a year later that they asked to intervene in New Jersey.

Plaintiffs place some reliance on Judge Sarokin's statement that his execution of the consent judgments "merely represents the embodiment of the agreement by the parties but does not constitute a review and approval of the terms and conditions." They argue that this demonstrates a lack of intent to invoke preclusion.

The decrees, however, expressly stated that they were agreements for the entry of final judgment, and Judge Sarokin did sign them. On their face, they terminated judicial consideration of the matter and returned it to the administrative process. As the Supreme Court has often stated, "the scope of a consent decree must be discerned within its four corners, ... not as it might have been written had the plaintiff established his factual claims and legal theories in litigation." *United States v. Armour & Co.,* 402 U.S. 673, 682, 91 S.Ct. 1752, 1757, 29 L.Ed.2d 256 (1971); *see also Firefighters Local Union No. 1784 v. Stotts,* —— U.S. ——, ——, 104 S.Ct. 2576, 2584, 81 L.Ed.2d 483 (1984); *Fox v. Department of Housing and Urban Development,* 680 F.2d 315, 319–20 (3d Cir.1982).

Moreover, the judge's explanation cannot be viewed in isolation. There had been adjudication of the identical issues in the New York action, and the decision there, not having been appealed, was final. At least with respect to the City of New York, therefore, the EPA was already committed to rulemaking revision. Whether, in light of this development, the agency was free to adopt a contrary position in the New Jersey action was a concern Judge Sarokin himself raised. In addition, he commended the parties for having "followed [his] suggestion that the only way this matter could and should be resolved was through agreement on the part of the parties."

Under the circumstances, therefore, we are not persuaded that the bench comments impaired the finality of the consent decrees.

■■■ Preclusion of a third person from collateral attack on a consent decree to which he was not a party is a step to be taken cautiously and only in unusual circumstances. The factors present here are not typical and emphasize the narrowness of our holding. In sum:

(1) plaintiffs were aware of both suits, knew that their interests were at stake, and monitored both actions closely;

(2) the two suits were inextricably intertwined in that the statute, regulations, and dumping area at issue were identical;

(3) the New York case was adjudicated in an adversary proceeding and the plaintiffs chose not to file a motion to intervene, even for the purpose of appeal when it became obvious that E.P.A. would not seek appellate review;

(4) plaintiffs filed an amicus brief in the New Jersey suit rather than attempting to timely present the same issues as intervenors;

(5) plaintiffs failed to appeal the denial of their motions for intervention in the New Jersey action; and

(6) the New Jersey consent decrees established only interim relief, rather than final resolution of the questions at issue, and provided for administrative proceedings in which plaintiffs could participate.

Clearly, plaintiffs were not outsiders unaware of litigation in progress that would ultimately affect their interests. In a deliberate choice of litigation strategy, they chose to stand on the sidelines, wary but not active, deeply interested, but of their

own volition not participants. Although plaintiffs may not have had their day in court as litigants, they had the opportunity and for reasons of their own adopted a different approach. Plaintiffs cannot, at this stage, assert persuasively that the interest of finality should not prevail.

The judgment of the district court will be affirmed.